**IN THE UNITED STATES DISTRICT COURT**

**FOR THE MIDDLE DISTRICT OF FLORIDA**

**TAMPA DIVISION**

| | |
|---|---|
| **ENVIRONMENTAL PROTECTION COMMISSION OF HILLSBOROUGH COUNTY, FLORIDA** )<br>)<br>)<br>) | |
| **Plaintiff,** ) | |
| **v.** ) | **Case No.:_____** |
| ) | |
| **MERCEDES-BENZ USA, LLC;** )<br>**DAIMLER AKTIENGESELLSCHAFT;** )<br>**ROBERT BOSCH , LLC; ROBERT** )<br>**BOSCH GmbH;** )<br>) | |
| **Defendants.** ) | |

**COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF AND
DEMAND FOR JURY TRIAL**

Plaintiff Environment Protection Commission of Hillsborough County, Florida (hereinafter the "EPC"), alleges the following against Defendants Mercedes-Benz USA, LLC, Daimler Aktiengesellschaft (together, "Mercedes"), Robert Bosch GmbH and Robert Bosch LLC (together, "Bosch") (collectively, "Defendants") based upon investigation, Defendants' acknowledgement and scientific evidence:

**INTRODUCTION**

1.     This case is a byproduct of one of the most brazen corporate crimes in history involving diesel vehicles made by Volkswagen, Audi, Porsche, Mercedes, General Motors ("GM"), and Fiat Chrysler Automobiles N.V. ("FCA") engineered to dupe the United States Environmental Protection Agency ("EPA"), among other regulators into approving for sale and use hundreds of thousands of non-compliant cars.[1] The diesel vehicles made by these manufacturers evaded emissions standards with the help of certain software known as a "defeat device" that turns off or down emissions controls when the vehicles sense they are not in a test environment, and the extent of their crimes are still being unraveled by investigation subsequent to ongoing litigation beginning in 2015.

2.     Bosch, through the Mercedes brand, made identical and/or substantially similar claims, representations, and marketing concerning the environmental characteristics of the BlueTEC Clean Diesel as did their Volkswagen, Audi, GM and FCA counterparts. Certain Mercedes BlueTEC vehicles exceed federal and state emission standards, emitting far more

---

[1] Volkswagen pled guilty to criminal violations of the Clean Air Act, Mercedes and Bosch are under investigation by the Department of Justice, and FCA has been sued by the EPA for violating the Clean Air Act for improper emissions in thousands of 2014-2016 Dodge Ram 1500 EcoDiesels and 2014-2016 Jeep Grand Cherokee EcoDiesels.

nitrogen oxides (NOx) on the road than in the emission certification testing environment.

3.     Mercedes got away with its scheme for years, and approximately 250,000 of their affected vehicles (the "Affected Vehicles") were sold throughout the United States, including in Hillsborough County, Florida.

4.     The Mercedes Affected Vehicles employ an astonishing wide range of Defeat Devices including: (1) a timer that reduces effectiveness of emissions controls after a short period; (2) a defeat device that detects road grade and reduces overall emissions system performance; and (3) a defeat device that turns off or down emissions controls when certain temperature parameters are met.

5.     Bosch by and through the Mercedes Brand rely upon the suppression and concealment of critical material facts about the operation and true environmental characteristics of BlueTEC Clean Diesel vehicles.  As a consequence of this critical concealed material fact, consumers and regulatory agencies and authorities, including the EPA and the EPC were unaware that— contrary to the clean diesel message transmitted in a uniform and consistent way by Mercedes—the Affected  Vehicles are not clean diesels at all and, to the contrary, emit enormous amounts of NOx pollutants into the atmosphere.

6.     In short and pertinent part, the Defendants secretly embedded software algorithms in the Affected Vehicles in order to cheat, defeat and render inoperable the vehicles' emission control systems.

## JURISDICTION AND VENUE

7.     This case is filed in the United States District Court for the Middle District of Florida (Tampa) pursuant to 28 U.S.C. § 1332 on the basis that complete diversity exists among the parties and the amount in controversy exceeds $75,000.

8.     Hillsborough County, Florida, including the EPC, as further described below, is located in the Middle District of Florida (Tampa). In addition, there are presently at least a great number of Affected Vehicles registered in Hillsborough County. The Defendants, as described in detail below, are not residents of the Middle District of Florida.

9.     The EPC seeks statutory penalties, as described in further detail herein, for violation of the EPC's duly promulgated rules. The maximum penalty of $5,000 per violation, with each day in noncompliance constituting a separate violation, when applied to the total number of Affected Vehicles, yields a potential civil penalty which far surpasses the $75,000 threshold required for the exercise of diversity of jurisdiction.

## PARTIES

### A. Plaintiff

10.     The Environmental Protection Commission of Hillsborough County, Florida ("EPC") is a unit of the government in Hillsborough County, Florida. The EPC was created in 1967 by the Hillsborough County Environmental Protection Act ("Enabling Act") Fla. Laws 84-446 (as amended by Fla. Laws 87-495 (2005)), a special act of the Florida legislature, "to provide and maintain for the citizens and visitors of said county standards which will insure … atmospheric purity and freedom of the air from contaminants or synergistic agents injurious to human, plant, or animal life…." Enabling Act, § 2. (See Exhibit A, attached hereto). The EPC operates under the most recent version of the Enabling Act, Chapter 84-446, as amended by Chapter 87-495, Laws of Florida. Air quality in Hillsborough County is a pressing local issue as the County has struggled over the years to maintain compliance with the mandates of the Clean Air Act. In 2015, Hillsborough County's air quality, although much improved from the 1980s, was barely within the threshold for Clean Air Act compliance. Hillsborough County, its residents, and its businesses located therein, have invested more than one billion dollars in the past twenty years trying to clean up

Hillsborough's air and water, since they have a significant effect on the bay, residents, and the local economy. These efforts over the past twenty years by Hillsborough's government, residents, and businesses have been adversely impacted by the Defendants' actions as described herein.

11.     The Commission for the EPC consists of the duly elected members of the Hillsborough County Board of County Commissioners. Id., § 4. The EPC is funded annually by monies appropriated by the Board of County Commissioners. Id., § 20. The EPC has offices at 3629 Queen Palm Drive, Tampa, Florida 33619. The Board of County Commissioners is located at 601 East Kennedy Boulevard, Tampa, Florida 33602.

### B.     Defendants

12.     Defendant Mercedes-Benz USA, LLC ("Mercedes") is a Delaware limited liability corporation whose principal place of business is One Mercedes-Benz Drive, Sandy Springs, GA 30328-4312. Mercedes, through its various entities, designs, manufactures, markets, distributes and sells Mercedes automobiles in Hillsborough County, Florida and multiple other locations in the United States and worldwide. Mercedes and/or its agents designed, manufactured, and installed the BlueTEC Clean Diesel engine systems in the Affected Vehicles.

13.     Defendant Daimler Aktiengesellschaft ("Daimler AG") is a foreign corporation headquartered in Stuttgart, Baden-Württemberg, Germany. Daimler AG is engaged in the business of designing, engineering, manufacturing, testing, marketing, supplying, selling and distributing motor vehicles, including the Affected Vehicles, in the United States. Daimler AG engineered, designed, developed, manufactured and installed the emissions systems on the Affected Vehicles, manipulated the emission systems in such a manner so as to reduce the systems' effectiveness during on-road driving conditions, and exported these vehicles with the knowledge and understanding that they would be sold and serviced throughout the United States, including Hillsborough County, Florida. Daimler AG is the parent of, controls and communicates with Mercedes concerning virtually all aspects of the Affected Vehicles within the United States.

14.     Mercedes-Benz USA, LLC acts as the sole distributor for Mercedes-Benz vehicles in the United States, purchasing those vehicles from Daimler AG in Germany for sale in this country. On information and belief, the relationship between Daimler AG and Mercedes- Benz USA, LLC is governed by a General Distributor Agreement that gives Daimler AG the right to control nearly every aspect of Mercedes-Benz USA, LLC's operations—

including sales, marketing, management policies, information governance policies, pricing, and warranty terms.

15.     Robert Bosch LLC ("Bosch America") is a Delaware limited liability company with its principal place of business located at 38000 Hills Tech Drive, Farmington Hills, Michigan 48331. Bosch America is a wholly-owned subsidiary of Robert Bosch Gmbh. Bosch America directly and/or in conjunction with its parent Robert Bosch GmbH, at all material times, designed, manufactured, and supplied the defeat device to Mercedes for use in the Affected Vehicles.

16.     Robert Bosch GmbH is a German multinational engineering and electronics company headquartered in Gerlingen, Germany. Robert Bosch GmbH is the parent company of Robert Bosch LLC. Robert Bosch GmbH, directly and/or through its North-American subsidiary Robert Bosch LLC, at all material times, designed, manufactured, and supplied elements of the defeat device to Mercedes for use in the Affected Vehicles. Bosch GmbH is subject to the personal jurisdiction of this Court because it has availed itself of the laws of the United States through its management and control over Bosch, LLC, and over the design, development, manufacture, distribution, testing, and sale of hundreds of thousands of the defeat devices installed in

the Affected Vehicles sold or leased in the U.S. Employees of Bosch GmbH and Bosch LLC have collaborated in the emissions scheme with Mercedes in this judicial district and have been present in this district.

17.     Both Robert Bosch GmbH and Robert Bosch LLC operate under the umbrella of the Bosch Group ("Bosch Group"), which encompasses some 340 subsidiaries and companies. The Bosch Group is divided into four business sectors: Mobility Solutions (formerly Automotive Technology), Industrial Technology, Consumer Goods, and Energy and Building Technology. The Mobility Solutions sector, which supplies parts to the automotive industry, and its Diesel Systems division, which develops, manufacturers, and supplies diesel systems, are particularly involved in the wrongdoing described in the Complaint and include the relevant individuals at both Bosch GmbH and Bosch LLC. Bosch's sectors and divisions are grouped not by location, but by subject matter. Mobility Solutions includes the relevant individuals at both Bosch GmbH and Bosch LLC.

18.     Regardless of whether an individual works for Bosch in Germany or the U.S., the individual holds him or herself out as working for Bosch. This collective identity is captured by Bosch's mission statement: "We are Bosch," a unifying principle that links each entity and person within the

Bosch Group.[2] Bosch documents and press releases often refer to the source of the document as "Bosch" without identifying any particular Bosch entity. Thus, the identity of which Bosch Defendant was the author of such documents and press releases cannot be ascertained with certainty until Bosch GmbH and Bosch LLC respond to discovery requests in this matter.

19.    From at least 2005 to 2015, Robert Bosch GmbH, Robert Bosch LLC and currently unnamed Bosch employees were knowing and active participants in the creation, development, marketing, and sale of illegal defeat devices specifically designed to evade U.S. emissions requirements in vehicles sold solely in the United States. These vehicles include the Affected Vehicles, as well as diesels made by Volkswagen, Audi, Porsche, General Motors, and Fiat Chrysler (FCA).

20.    The following is a list, including the Mercedes vehicles in this case, of diesel models in the United States with Bosch-supplied software whose emissions exceed federal and EPC emission standards, and whose emissions are beyond what a reasonable consumer would expect from cars marketed as "clean" or "low emission": (all models 2007-2016) ML 320, ML

---

[2] Bosch 2014 Annual Report, Experiencing quality of life, available at http://www.bosch.com/media/com/bosch_group/bosch_in_figures/publications/archive/GB2014_EN.pdf.

350, GL 320, E320, S350, R320, E Class, GL Class, ML Class, R Class, S Class, GLK Class, GLE Class, and Sprinter (the Affected Vehicles).

21.     Each Bosch entity participated not just in the development of the defeat device, but in the scheme to prevent U.S. regulators from uncovering the device's true functionality. Moreover, Bosch's participation was not limited to engineering the defeat device (in a collaboration described as unusually close). Rather, Bosch LLC marketed "Clean Diesel" in the United States and lobbied U.S. regulators to approve "Clean Diesel," another highly unusual activity for a mere supplier. These lobbying efforts, taken together with evidence of each of Bosch's entity's actual knowledge that its software could be operated as a defeat device and participation in concealing the true functionality of the device from U.S. regulators, can be interpreted only one way under U.S. law: Bosch was a knowing and active participant in a massive, decade-long conspiracy with Volkswagen, Audi, Mercedes, FCA, GM and others to defraud U.S. consumers, regulators, and diesel car purchasers or lessees. Bosch GmbH and Bosch LLC have enabled over 1.3 million vehicles to be on the road in the United States at levels that exceed emissions standards and which use software that unlawfully manipulate emissions controls.

22.     Bosch's Diesel Systems division, which developed the electronic diesel control known as EDC17, is described as part of the Bosch Group. In the case of the Mobility Solutions sector, which oversees the Diesel Systems division, the Bosch Group competes with other large automotive suppliers.[3]

23.     The Bosch publication *Bosch in North America* represents that "Bosch supplies . .. clean-diesel fuel technology for cars and trucks." Throughout the document describing its North American operations, the company refers to itself as "Bosch" or "the Bosch Group."[4]

24.     The *Bosch in North America* document proclaims that Automotive Technology is "Bosch's largest business sector in North America." In this publication, Bosch never describes the actions of any separate Bosch legal entity, like Bosch LLC, when describing its business, but always holds itself out as "the Bosch Group."[5]

25.     Bosch was well aware that Mercedes was using its emissions control components as a defeat device and, in fact, worked with Mercedes to

---

[3]     See, e.g., Bosch's 2016 Annual Report, available at https://assets.bosch.com/media/global/bosch_group/our_figures/pdf/bosch annual-report-2016.pdf, at 23.

[4]     *Bosch in North America* (May 2007), available at http://www.bosch.us/ content/language1/downloads/BINA07.pdf, at 2.

[5]     *Bosch in North America* (May 2007), available at http://www.bosch.us/ content/language1/downloads/BINA07.pdf, at 5.

develop the software algorithms specifically tailored for the Affected Vehicles.

<h3 style="text-align:center"><u>FACTUAL ALLEGATIONS</u></h3>

**A. <u>Regulatory Standards</u>**

26.     The United States Government, through the Environmental Protection Agency (EPA), has passed and enforced laws designed to protect United States citizens from certain pollutants and chemicals and agents known to cause disease in humans. Automobile manufacturers must abide by these U.S. laws and must adhere to EPA rules and regulations. NOx is one of the most noxious emissions by-products and is highly regulated as a result. The EPA works with its federal, state and local regulatory partners to monitor and ensure compliance with clean air laws and regulations in order to protect human health and the environment. The Clean Air Act ("CAA") is the primary federal law governing air pollution.

27.     Under Title II, Part A of the Clean Air Act of 1990,[6] car manufacturers cannot sell new motor vehicles in the United States unless the vehicles comply with federal emission standards, including standards for the

---

[6] 42 U.S.C. §§ 7521.

emission of nitrogen oxides (NOx).[7] The CAA gives the Environmental Protection Agency (EPA) the authority to establish emission standards for new motor vehicles, § 7521(a)(1), and administer a certification program to ensure compliance with those standards, § 7525. This includes the authority to set emission limits for air pollutants, § 7521(b), and to promulgate standards governing the use of emission control devices, § 7521(a)(4)(A). Failure to comply with the CAA and regulatory emission standards for new motor vehicles can result in civil penalties, criminal penalties, or both.[8]

28.     Under Title II, Part A of the CAA, the federal government has authority to establish "standards applicable to the emission of any air pollutant from . . . new motor vehicles." 42 U.S.C. § 7521(a)(1). This includes the authority to set emission limits for air pollutants,[9] and to promulgate standards governing the use of emission control devices.[10] A device "that reduces the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use" is called a "defeat device," 40 C.F.R. § 86.1803-01, and is prohibited.[11]

---

[7] See 42 U.S.C. §§ 7521, 7525.
[8] See §§ 7413(c), 7524.
[9] § 7521(b).
[10] § 7521(a)(4)(A).
[11] See 42 U.S.C. § 7522(a)(3)(B).

Failure to comply with the CAA and regulatory emission standards for new motor vehicles can result in civil penalties, criminal penalties, or both.[12]

29.    The CAA is a joint venture, one that makes "the States and the Federal Government partners in the struggle against air pollution." *Gen. Motors Corp. v. United States,* 496 U.S. 530, 532 (1990). The basic division of responsibility in Title II of the CAA reflects the cooperative federalism principles that have long informed this nation's air pollution control laws.[13] Prior to 1955, the regulation of air pollution was the sole responsibility of the states as a matter of public health, and the states enacted various regulations pursuant to their historic police powers.[14]

30.    The current version of the CAA recognizes "that air pollution prevention . . . and air pollution control at its source is the primary responsibility of States and local governments." 42 U.S.C. § 7401(a)(3). In regard to air pollution from motor vehicles, Congress has taken a stronger lead

---

[12] See §§ 7413(c), 7524.

[13] See *Comm. for a Better Arvin v. EPA*, 786 F.3d 1169, 1173 (9th Cir. 2015) ("[T]he CAA has established a uniquely important system of cooperative federalism in the quest for clean air."); *GenOn REMA, LLC v. EPA,* 722 F.3d 513, 516 (3d Cir. 2013) ("This 'cooperative federalism' structure is a defining feature of the [CAA].").

[14] See Arthur C. Stern, History of Air Pollution Legislation in the United States, 32 J. Air Pollution Control Ass'n 44, 44, 47 (1982); see also, e.g., 1947 Cal. Stat. 1640; 1911 Iowa Acts 27; 1887 Minn. Special Laws 623.

in enforcing emission standards. Nevertheless, it has consistently preserved the legitimacy of state regulations.[15] In sum, the regulation of air pollution falls within the historic police powers of the states, *see Huron Portland Cement Co.*, 362 U.S. at 442, and the modern CAA maintains a cooperative federalism approach.[16]

31.     To obtain a certificate of conformity from the EPA, a manufacturer must submit an application to the EPA; the application must be submitted for each model year and it must include (among other things) test results from standardized federal emission tests that demonstrate compliance with the applicable emission standards. *See* 40 C.F.R. §§ 86.1843-01, 86.1844-01, 86.1848-01.

### B. Motivation

32.     In order to introduce a "Clean Diesel" Mercedes vehicle to the American consumer, Mercedes must apply for a certificate granted by the

---

[15] For instance, although Congress displaced state emission standards for new motor vehicles in 1967, *see* Air Quality Act of 1967, Pub. L. No. 90-148, § 208(a), 81 Stat. 485, 501 (1967); Clean Air Amendments of 1970, Pub. L. No. 91-604, § 8(a), 84 Stat. 1676, 1694 (1970), it has maintained a substantial role for states in post-sale implementation and enforcement ever since, see 42 U.S.C. §§ 7416, 7543(d); *see also Ashoff v. City of Ukiah*, 130 F.3d 409, 412–13 (9th Cir. 1997) (describing how the CAA's citizen suit provision enables citizens to "sue on the basis of more stringent state standards").

[16] *see Gen. Motors Corp.,* 496 U.S. at 532.

EPA wherein Mercedes attested to the EPA and other agencies emissions test results in accordance to the prerequisite standards.

33.　　Diesel engines pose a difficult challenge to the environment because they have an inherent trade-off between power, fuel efficiency, and emissions. Compared to gasoline engines, diesel engines generally produce greater torque, low-end power, better drivability and much higher fuel efficiency. But these benefits come at the cost of much dirtier and more harmful emissions.

34.　　In order to produce a diesel engine that has desirable torque and power characteristics, good fuel economy, and emissions levels low enough to meet the stringent European and United States governmental emission standards, Mercedes developed the BlueTEC™ diesel engine. The BlueTEC name is a general trade name used to describe a number of in-cylinder and after-treatment technologies used to reduce and control emissions in diesel vehicles. The primary emission control after-treatment technologies include a diesel particulate filter (DPF) and a selective catalytic reduction (SCR) system. The DPF traps and removes particulate (soot) emissions, while the SCR system facilitates a chemical reaction to reduce NOx into less harmful substances, such as nitrogen and oxygen.

35.     One by-product of diesel combustion is NOx, which generally describes several compounds comprised of nitrogen and oxygen atoms. These compounds are formed in the cylinder of the engine during the high temperature combustion process. NOx pollution contributes to nitrogen dioxide particulate matter in the air and reacts with sunlight in the atmosphere to form ozone. Exposure to these pollutants has been linked with serious health dangers, including serious respiratory illnesses and premature death due to respiratory-related or cardiovascular-related effects.

36.     In 1998, the EPA established new federal emission standards for light duty vehicles, the type of vehicles at issue here, including stricter NOx emission standards. Manufacturers were required to comply with the new standards beginning with model year 2007 vehicles.

37.     Identical to the allegations in *Volkswagen*[17], Bosch concluded that some of its Mercedes diesel engine vehicles would not be able to meet the heightened NOx emission standards while still operating at a performance level that could attract customers. Therefore, Bosch employees developed and installed two defeat devices that would enable the Affected Vehicles' diesel

---

[17] *In Re: Volkswagen "Clean Diesel") Marketing, Sales Practices, and Products Liability Litigation*, MDL No: 2672 CRB (JSC) (Doc. 4457).

engines to pass federal emission tests, even though the vehicles could not actually meet the NOx emission standards while being driven on the street.

38.    The Affected Vehicles detect when the vehicle is undergoing official emissions testing and turns full emissions controls on only during the test. But otherwise, while the vehicle is running, the emissions controls are suppressed. This results in cars that meet emissions standards in the laboratory or state testing station, but during normal operation emit far more than the standard allowed under United States laws and regulations. Because the Affected Vehicles were not designed to comply with NOx emission standards except during the short periods of testing, the increased stress on the exhaust system from being driven too long in compliance with NOx standards caused hardware failures, resulting in Bosch and Mercedes redesigning and installing newly created software algorithms in the Affected Vehicles.

39.    A shut-off device in the engine management of the Affected Vehicles stops NOx cleaning when ambient temperatures drop below 50 degrees Fahrenheit and in other, unspecified circumstances. So, while the Mercedes diesels with the BlueTEC Clean Diesel engine are designed to pass official emissions tests, which are usually conducted at a temperature *exceeding* 50 degrees, the vehicles nonetheless emit far more pollution than

government emissions standards in the United States permit when the temperature drops below 50 degrees.

40.     In general, the defeat devices trigger a reduction in performance of the two main NOx reduction systems in a clean diesel vehicle: 1) the exhaust gas recirculation (EGR) system and 2) selective catalytic reduction (SCR).

41.     EGR feeds some of the exhaust gas back into the engine intake using a controllable valve that routes the exhaust from the exhaust manifold, through an EGR cooler, and into the engine intake. The mixture of exhaust gas with fresh incoming air reduces NOx generated in the cylinder during normal engine operation. Closing the valve that allows exhaust gases to enter the intake will shut the system off. The amount of EGR can be controlled by opening the valve to a larger or smaller extent. A lower "percentage" of EGR indicates a valve that is more closed, which restricts the amount of EGR. Conversely, a high percentage indicates a high level of EGR. High EGR results in a more significant reduction in NOx emissions. Simply speaking, high EGR rates lead to lower NOx. The EGR rate is controlled by the engine's electronic control module (ECM) and can thus be programmed to behave in any way.

42.     The SCR system is a catalyst through which all of the exhaust stream flows. When urea (sometimes called diesel exhaust fluid (DEF) or AdBlue) is injected into the tailpipe upstream of the SCR system, a reaction takes place on the surface of the catalyst to reduce NOx to nitrogen and water. With no urea present, the reaction will not take place, and no NOx reduction will occur over the SCR catalyst. Therefore, by changing the amount of urea injected, the effectiveness of the SCR system can be altered by the engine's ECM. When high levels of urea are injected, high NOx reduction occurs provided there is sufficient exhaust temperature. If no urea is injected, no NOx reduction takes place.

43.     NOx emissions are first reduced in the engine cylinder by various means related to injection timing and engine design. The EGR system is the next system in line to reduce NOx coming out of the engine. The SCR system comes last in line.

44.     Mercedes manipulated the programming of the software to reduce EGR and SCR effectiveness at various times using defeat devices (auxiliary emission control devices, or AECDs, that are not approved by the EPA or California Air Resources). The programming of these vehicles is meant to cheat the emissions certification standards.

45. The Affected Vehicles were tested with a portable emission measurement system (PEMS) as well as a chassis dynamometer running the federal certification FTP-75 and highway fuel efficiency tests ("HWFET"). The vehicles were outfitted with on-board diagnostics (OBD) monitoring systems to monitor data on the vehicle's ECM (e.g., EGR rate, exhaust gas temperatures, SCR inlet and outlet NOx, etc).

46. Bosch worked with Mercedes to utilize the EDC Unit 17 to create a unique set of specifications and software code to manage the vehicles' engine operation. Bosch's EDC Unit 17 controls emissions by periodically reading sensor values, evaluating a control function, and controlling actuators based on the control signal.[18] Sensor readings include crankshaft position, air pressure, air temperature, air mass, fuel temperature, oil temperature, coolant temperature, vehicle speed, exhaust oxygen content, as well as driver inputs such as accelerator pedal position, brake pedal position, cruise control setting, and selected gear. Based on sensor input, EDC17 controls and influences the fuel combustion process including, in particular, fuel injection timing, which

_____

[18] Moritz Contag *et al.*, How They Did It: An Analysis of Emission Defeat Devices in Modern Automobiles, p.4 (2017).

affects engine power, fuel consumption, and the composition of the exhaust gas.[19]

47.     All Bosch ECUs, including the EDC17, run on complex, highly proprietary engine management software over which Bosch GmbH exerts near-total control. In fact, the software is typically locked to prevent customers, like Mercedes, from making significant changes on their own. Accordingly, both the design and implementation are interactive processes, requiring Bosch's close collaboration with the automaker throughout the entire process.

48.     With respect to the Affected Vehicles, the EDC Unit 17 was enabled by Bosch GmbH and Mercedes to surreptitiously evade emissions regulations. Bosch GmbH and Mercedes worked together to develop and implement a specific set of software algorithms for implementation in the Affected Vehicles, including algorithms which enabled Mercedes to adjust fuel levels, EGR, air pressure levels, and even urea injection rates.[20]

---

[19] *Id.*

[20] *See*, *e.g.*, *Engine management*, Bosch Auto Parts, http://de.bosch automotive.com/en/parts_and_accessories/motor_and_sytems/diesel/engine_management_2/engine_control_unit_1.

49.     When carmakers test their vehicles against EPA emission standards, they place their cars on dynamometers (large rollers) and then perform a series of specific maneuvers prescribed by federal regulations. Bosch's EDC Unit 17 gave Mercedes and other manufacturers the power to detect test scenarios by monitoring vehicle speed, acceleration, engine operation, air pressure, and even the position of the steering wheel. When the EDC Unit 17's detection algorithm detected that the vehicle was on a dynamometer (and undergoing an emission test), additional software code within the EDC Unit 17 downgraded the engine's power and performance and upgraded the emissions control systems' performance by switching to a "dyno calibration" to cause a subsequent reduction in emissions to legal levels. Once the EDC Unit 17 detected that the emission test was complete, the EDC Unit would then enable a different "road calibration" that caused the engine to return to full power while reducing the emissions control systems' performance, and consequently caused the car to spew the full amount of illegal NOx emissions out on the road.[21]

---

[21] Russell Hotten, *Volkswagen: The scandal explained*, BBC (Dec. 10, 2015), http://www.bbc.com/news/business-34324772.

50. Despite its operational failings, Mercedes proclaims itself "#1 in $CO_2$ emissions for luxury vehicles" and promotes its Clean Diesel vehicles as "Earth Friendly" and "With BlueTEC, cleaner emissions are now an equally appealing benefit." Mercedes aggressively and consistently markets its BlueTEC vehicles across all media as "the world's cleanest and most advanced diesel" with "ultra-low emissions, high fuel economy and responsive performance" that emits "up to 30% lower greenhouse-gas emissions than gasoline." Mercedes also represents that its BlueTEC vehicles "convert[] the nitrogen oxide emissions into harmless nitrogen and oxygen" and "reduces the nitrogen oxides in the exhaust gases by up to 90%."

51. This workaround is illegal. Mercedes' illegal workaround was facilitated by its close partnership with Bosch, which enjoyed a sizable portion of its annual revenue from manufacturing parts used in Mercedes' and other manufacturers' diesel vehicles.[22] Bosch was well aware that Mercedes was using its emissions control components as a defeat device and, in fact, worked

---

[22] Approximately 50,000 of Bosch's 375,000 employees worked in the diesel technology operations branch of Bosch. *See Bosch probes whether its staff helped VW's emissions rigging*, Automotive News (Jan. 27, 2016), http://www.autonews.com/article/20160127/COPY01/301279955/bosch-probes-whether-its-staff-helped-vws- emissions-rigging.

with Mercedes to develop the software algorithms specifically tailored for the Affected Vehicles.

52.     Mercedes is not the only manufacturer to have mislead consumers about the environmental aspects of their cars. Volkswagen has entered into a consent decree admitting its vehicles contained defect devices as has Audi. Additionally, the EPA has issued a notice of violation and has brought suit against Fiat Chrysler America N.V. "FCA" over certain of its vehicles. FCA is also the subject of emission litigation over its Dodge 2500 vehicles. At the heart of each of these manufacturers emissions system is the Bosch EDC 17.

53.     Mercedes BlueTEC "Clean Diesel" vehicles promised that in converting nitrogen oxide emissions into "pure, earth-friendly nitrogen and water," that they produce "fewer greenhouse gases than gasoline," that they exceed "statutory [emissions] requirements," that they reduce "Nitrogen Oxides by up to 80%," and that they are "for the air we breathe."



BlueTEC. The cleanest diesel technology in the world. For the air we breathe.    Mercedes-Benz

54.    Subsequent testing independent of Bosch has revealed Mercedes vehicles certified as compliant in the United States emit dangerous nitrogen oxides (NOx) at levels many times higher than (i) their gasoline counterparts, (ii) what a reasonable consumer would expect from a "Clean Diesel," (iii) what Mercedes had advertised, and (iv) United States Environmental Protection Agency and California Air Resources Board maximum standards. The Mercedes "Clean Diesel" is far from "clean."

## C. **"Defeat Device" in Detail**

55.    Mercedes recently admitted in separate litigation that a shut-off device in the engine management of certain BlueTEC diesel cars stops NOx cleaning when ambient temperatures drop below 50 degrees Fahrenheit and under other, unspecified circumstances. Testing of the Affected Vehicles at highway speeds, at low temperatures, and at variable speeds, indicate a

systemic failure to meet emissions standards. Low temperature testing at highway speeds, for example, produced emissions that were 8.1 to 19.7 times the highway emissions standard. Testing at low temperatures at variable speeds produced emissions as high as 30.8 times the standard.

56.     The Mercedes emissions "shut off device" goes well beyond when the temperature drops below 50 degrees Fahrenheit. Testing of the Affected Vehicles has also revealed that Mercedes BlueTEC vehicles do not meet emission standards in virtually all real world driving conditions. In virtually every road test at a variety of speeds and temperatures, the emissions exceeded emissions standards.

57.     Testing also reveals that Mercedes intentionally shuts down or severely limits the emissions control system when the BlueTEC vehicles are on the road. Testing on the Affected Vehicles revealed that, while the Mercedes BlueTEC vehicle's on-road emissions were very high and exceeded federal standards, the same vehicle when tested on a dynamometer using EPA testing protocols had low emissions and either passed the tests, or were within a close margin of doing so.

58.     Further, testing by the German Federal Department of Motor Vehicles revealed that certain Mercedes vehicles, in addition to vehicles

produced by other manufacturers, had "conspicuously high NOx emissions that apparently could not be sufficiently explained from a technical point of view." The findings, announced April 22, 2016, have led to the "voluntary" recall of 630,000 vehicles in Europe, including Mercedes vehicles.

59.     Mercedes diesel vehicles also failed on-road emissions tests conducted by French authorities, leading the French government to order Mercedes to present plans to reduce the vehicles' emissions.

60.     The core components of the BlueTEC Clean Diesel emission system are largely the same across market segments, so the underlying technical shortcomings that would motivate Mercedes to employ defeat strategies in Europe would also motivate them to cheat in the United States. Thus, investigations in Europe into underlying motivations and sources of cheating are highly applicable in the U.S. and directly demonstrate the factual accuracy and plausibility of the allegations made here. Put simply, the same defeat strategies or variants of those strategies are deployed in the United States to address the same underlying technological limitations. A diesel engine does not become easier to make emissions compliant by crossing the Atlantic.

### D.     Environmental and Public Health Impact

61.     NOx contributes to ground-level ozone and fine particulate matter. According to the EPA, "Exposure to these pollutants has been linked with a range of serious health effects, including increased asthma attacks and other respiratory illnesses that can be serious enough to send people to the hospital. Exposure to ozone and particulate matter have also been associated with premature death due to respiratory-related or cardiovascular-related effects. Children, the elderly, and people with pre-existing respiratory disease are particularly at risk for health effects of these pollutants."

62.     One prominent study published in NATURE estimates that there are 38,000 deaths worldwide due to excess NOx emissions. A study published in ENVIRONMENTAL RESEARCH LETTERS (2017) estimates 10,000 deaths in Europe due to excess NOx emissions.

63.     As a result of Defendants' emissions system tampering, and their failure to disclose that under normal operating conditions the Affected Vehicles are not "clean" diesels, emit more pollutants than do gasoline powered vehicles, and emit more pollutants than permitted under federal and state laws, Plaintiff has suffered and will continue to suffer environmental and economic harm as long as the Affected Vehicles remain on the road.

   E.  **Revelation and Subsequent, Relevant Litigation**

64.     In August 2015, a Volkswagen whistleblower informed federal regulators about the defeat device in the 2.0 liter vehicles. Eventually, Volkswagen disclosed the entire scheme affecting both the 2.0 and 3.0 liter vehicles to federal regulators. The EPA subsequently issued notices of violation and filed civil and criminal actions against Volkswagen for violating the CAA. In the civil action, the EPA charged Volkswagen with installing a defeat device on new motor vehicles, in violation of 42 U.S.C. § 7522(a)(3)(B), and tampering with emission control systems, in violation of § 7522(a)(3)(A), among other things. In the criminal action, the EPA charged Volkswagen with conspiracy, 18 U.S.C. § 371, obstruction of justice, § 1512(c), and introducing imported merchandise into the United States by means of false statements, § 542. Volkswagen pleaded guilty to the criminal charges and agreed to pay a $2.8 billion fine to the United States. Pursuant to the plea agreement, Volkswagen stipulated to a detailed statement of facts regarding the defeat devices and agreed not to "contest the admissibility of, nor contradict" those stipulated facts "in any proceeding." The plea agreement did not give Volkswagen "any protection against prosecution" from state or local governments. Volkswagen also settled the civil CAA claims, entering into three consent decrees with the United States.  Other than California

(which entered into the first and second consent decrees), no other state or local government released Volkswagen from liability. To the contrary, each state expressly reserved its ability to sue Volkswagen for damages. In total, Volkswagen's liability exceeded $20 billion

65.     Volkswagen settled the EPA's criminal and civil actions for over $20 billion, but failed to obtain a release of liability from state and local governments. Plaintiff EPC seeks to impose penalties for violation of their laws prohibiting tampering with emission control systems.

66.     EPC's claims were transferred to the district court presiding over the Multidistrict Litigation ("MDL") as tag-along actions. Volkswagen moved to dismiss the EPC's claims for failure to state a claim. The district court granted the motion. In 2017, The district court held that the EPC's actions were preempted by the Clean Air Act.

67.     The EPC appealed, and in the summer of 2020, the Ninth Circuit[23] reversed in part the District Court's holding: By its terms, § 209(a) preempts state and local regulations "relating to the control of emissions from new motor vehicles." 42 U.S.C. § 7543(a) (emphasis added). *The provision*

_____

[23] *In Re: Volkswagen "Clean Diesel") Marketing, Sales Practices, and Products Liability Litigation,* No. 18-15937 (Dkt. 75-1).

*does not apply to post-sale emissions tampering.* Section§ 209(d) preserves state and local governments' authority to prohibit tampering with emission control systems in post-sale vehicles. Section 209(d) of the CAA provides: "Nothing in this part shall preclude or deny to any State or political subdivision thereof the right otherwise to control, regulate, or restrict the use, operation, or movement of registered or licensed motor vehicles." 42 U.S.C. § 7543(d).

68.     The Ninth Circuit further held that "operation," is defined as "the quality or state of being functional or operative" or the "method or manner of functioning." Operation, Webster's Third New International Dictionary 1518 (2002). Removing or making inoperable a vehicle's emission control system (i.e., tampering) affects the vehicle's "quality" and "method" of functioning (i.e., operation).

69.     Since Mercedes activated the defeat devices in their vehicles through fully implementing software algorithms on the vehicles, Bosch designed the defeat devices for Mercedes as to their specifications for all the Affected Vehicles.   Unlike all the negative publicity which VW received before they settled with the EPA, Mercedes remained silent.  Mercedes had been using a defeat device in their automobiles which caused them to produce

a much higher level of nitrogen oxides and other pollutants than had been reported to the EPA.

70.     Mercedes did not act alone. At the heart of the diesel scandal in the United States and Europe are Bosch GmbH and Bosch LLC. Each Bosch entity was an active and knowing participant in the scheme to evade U.S. emissions requirements. In vehicles manufactured by Volkswagen, GM, Mercedes and Fiat Chrysler America, Bosch GmbH manufactured, tested, and distributed the electronic diesel control known as the EDC17 ("EDC") that allowed Mercedes to implement the defeat device, and Bosch LLC helped promote "Clean Diesel" in the United States and acted to deceive regulators as to compliance with emissions standards. Absent Bosch's active cooperation in the development of the EDC and its constituent software, the fraud perpetrated by Mercedes would not have been possible.

71.     Central to the diesel scandal in the United States and Europe are Bosch GmbH and Bosch. Each Bosch entity was an active and knowing participant in the scheme to evade U.S. emissions requirements. In particular, Bosch designed, manufactured and tested the EDC that allowed Mercedes to implement the defeat device. Without Bosch's knowing and active

cooperation, Mercedes would not have been able to carry out the "Clean Diesel" scheme outlined in this complaint.

72.     The entire emission architecture, from fuel injection to exhaust gas recirculation (EGR) and selective catalytic reduction (SCR) dosing, is controlled by the Bosch EDC 17. Bosch's and Bosch GmbH's business model is not to just sell the hardware but also to sell the follow on services, which includes programming the EDC 17 for emission testing purposes. Because the EDC 17 software is highly proprietary and contains valuable intellectual property, each of Bosch's entities' cooperation in programming that software to enable the "Clean Diesel" scheme was essential.

73.     The EPC alleges that the following Mercedes models powered by BlueTEC diesel fueled engines have been previously sold, and are currently operating and/or being serviced as a result of the unlawful, unfair, deceptive, and otherwise defective emission controls utilized by Mercedes: (all 2007-2016) ML 320, ML 350, GL 320, E320, S350, R320, E Class, GL Class, ML Class, R Class, S Class, GLK Class, GLE Class, and Sprinter.

74.     Plaintiff EPC brings this action individually and seek damages and equitable relief for Mercedes' misconduct related to the design, manufacture, installation, and service of engineering defeat devices of the

Affected Vehicles with unlawfully high emissions within Hillsborough County, Florida, as alleged in this Complaint.

75.     The alleged "defeat device scheme" violates EPC Rule Chapter 1-8 that prohibit any "person" from (1) "tampering with vehicle emission control systems" and (2) manufacturing defeat devices, such as the ones employed by the Defendants. Hillsborough seeks injunctive relief and monetary penalties, jointly and severally, of up to $5,000 per day for each of the  Affected Vehicles allegedly ever registered in Hillsborough County, for the nine-year period from 2007 to 2016.

## TOLLING OF THE STATUTE OF LIMITATIONS

### A.  Discovery Rule Tolling.

76.     Plaintiff EPC had no way of knowing about Defendants' deception or software algorithms with respect to the comparatively and unlawfully high emissions of Mercedes' Affected Vehicles.

77.      In fact, Defendants continue to market the Affected Vehicles as "clean" diesels that have lower emissions than gasoline vehicles and also continue to claim that Affected Vehicles comply with EPA emissions standards.

78.     Within the time period of any applicable statutes of limitation, the EPC could not have discovered through the exercise of reasonable diligence that Defendants were concealing the conduct complained of herein and misrepresenting their true position with respect to the emission qualities of the Affected Vehicles.

79.     Plaintiff EPC did not discover, and did not know of facts that would have caused a reasonable person to suspect, that Defendants did not report information within its knowledge to federal and state authorities, its dealerships, or consumers; nor would a reasonable and diligent investigation have disclosed that Defendants had concealed information about the true emissions of the Affected Vehicles, which was discovered only shortly before this action was filed. Nor in any event would such an investigation on the part of Plaintiff EPC have disclosed that Defendants valued profits over truthful marketing and compliance with law.

80.     For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims as to the Affected Vehicles.

**B. <u>Fraudulent Concealment Tolling</u>**

81. All applicable statutes of limitation have also been tolled by Defendants' knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

82. Instead of disclosing its emissions scheme, or that the quality and quantity of emissions from the Affected Vehicles were far worse than represented, and of its reckless disregard of law, Defendants falsely represented that the Affected Vehicles had emissions cleaner than their gasoline powered counterparts, complied with federal and state emissions standards, that the diesel engines were "Clean," and that it was a reputable manufacturer whose representation could be trusted.

## C. Estoppel.

83. Defendants were under a continuous duty to disclose to Plaintiff EPC the true character, quality, and nature of emissions from the Affected Vehicles, and of those vehicles' emissions systems.

84. Defendants knowingly, affirmatively, and actively concealed or recklessly disregarded the true nature, quality, and character of the emissions systems, and the emissions, of the Affected Vehicles.

85. Based on the foregoing, Defendants are estopped from relying on any statutes of limitations in defense of this action.

## CLAIMS FOR RELIEF

## COUNT I

## MONETARY PENALTIES FOR VIOLATION OF EPC RULE CHAPTER 1-8, "MOBILE SOURCE"

86.     Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

87.     EPC Rule Chapter 1-8, "Mobile Source," was enacted on September 29, 1987, "for the purpose of implementing the intent of the Florida Legislature as declared in the Environmental Protection Act of Hillsborough County, to insure the atmospheric purity and freedom of the air in Hillsborough County from contaminants or synergistic agents resulting from the improper use and combustion of fuels in motor vehicles, or any other air contaminants released by the improper operation or servicing of motor vehicles." EPC Rule section 1-8.01 (see Exhibit B, attached hereto).

88.     EPC Rule Chapter 1-8 prohibits tampering with vehicle emission control systems and further prohibits the manufacture, installation, sale, or advertisement of defeat devices, such as the ones employed by the Defendants in the above described defeat device scheme. The rule provides: "No person shall tamper, cause, or allow the tampering of the emission control system of any motor vehicle."

89.     The Defendants also violated EPC Rule section 1-8.05(1) as described above by tampering with the emission control systems of Affected Vehicles registered in Hillsborough County, and manufacturing and installing defeat devices in Affected Vehicles registered in Hillsborough County.

90.     Furthermore, the Defendants' conduct in tampering with the emission control systems of used Affected Vehicles registered in Hillsborough County, through a program of newly created field fixes and recall campaigns, constitutes separate and independent violations of EPC Rule Chapter 1-8.

91.     As such, the defendants are liable, jointly and severally, for penalties pursuant to Section 17 of the Enabling Act, which provides a civil penalty for EPC rules violations as follows:

> Violation is punishable by a civil penalty of not more than $5,000 for the first offense and of not more than $5,000 for each offense thereafter. Each day during any portion of which such violation occurs constitutes a separate offense.

## COUNT II

## INJUNCTIVE RELIEF FOR VIOLATION OF EPC RULE CHAPTER 1-8, "MOBILE SOURCE"

92.     Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

93.     Defendants' conduct, as described above, has violated EPC Rule Chapter 1-8, "Mobile Source," with respect to the Affected Vehicles in Hillsborough County, and has caused said vehicles to be in non-compliance with EPA regulations.

94.     The Enabling Act, section 18 (5), provides for the imposition of injunctive relief to enforce compliance with EPC Rules:

> The commission may institute a civil action in a court of competent jurisdiction to seek injunctive relief to enforce compliance with this chapter or any rule, regulation, permit, certification, or order, to enjoin any violation specified in section 16 or section 17(1), and to seek injunctive relief to protect or restore the air, waters, and property, including animal, plant, and aquatic life from injury caused or threatened by any violation.

Enabling Act, § 18 (5).

95.     Accordingly, the EPC seeks an order of injunctive relief against Defendants to desist from further deceptive distribution, sales, and lease practices with respect to the Affected Vehicles, and directing the Defendants to permanently, expeditiously, and completely repair the Affected Vehicles so that no further harm is caused to the air or environment of Hillsborough County.

WHEREFORE, Plaintiff EPC, demands judgment for damages against Defendants, including costs, interest and such further and other relief as the Court deems proper.

## PRAYER FOR RELIEF

The EPC requests the Court enter judgment against the Defendants and in favor of the EPC, and grant the following relief:

A. an award to the EPC of statutory penalties and damages, including interest, in an amount to be proven at trial;

B. an award of attorneys' fees and costs, as allowed by law;

C. an award of pre-judgment and post-judgment interest, as provided by law;

D. leave to further amend this Complaint as may be necessary to conform to evidence obtained through discovery and/or at trial; and

E. Such other relief as may be appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), the plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Dated: September 24, 2020          Respectfully submitted,

BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.

By:    */s/ W. Daniel "Dee" Miles*
W. Daniel "Dee" Miles, III

W. Daniel "Dee" Miles, III*
H. Clay Barnett*
Archie I. Grubb, II*
BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.
218 Commerce Street
Montgomery, AL 36104
Telephone:  (334) 269-2343
Facsimile:  (334) 954-7555
Dee.Miles@BeasleyAllen.com
Clay.Barnett@BeasleyAllen.com
Archie.Grubb@BeasleyAllen.com

*\* to be admitted pro hac vice*

*/s/ Luis Martinez-Monfort*
Luis Martinez-Monfort
Florida Bar No. 0132713
GARDNER BREWER MARTINEZ-
MONFORT, P.A.
400 North Ashley Drive, Suite 1100
Tampa, Florida  33602
Telephone: (813) 221-9600
Facsimile: (813) 221-9611
lmmonfort@gbmmlaw.com
litigation@gbmmlaw.com
**Designated Trial Counsel per Local
Rule 1.05(c)**

*/s/ Thomas L. Young*
Thomas L. Young
Florida Bar No. 0231680
LAW OFFICE OF THOMAS L.
YOUNG, P.A.
209 South Howard Ave.
Tampa, Florida 33606

Telephone: 813-251-9706
Facsimile: 813-364-1908
tyoung@tlylaw.com

Attorneys for Plaintiff, The
Environmental Protection Commission of
Hillsborough County, Florida