**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

ENVIRONMENTAL PROTECTION
COMMISSION OF HILLSBOROUGH
COUNTY, FLORIDA,

     Plaintiff,

v.                                                    Case No.: 8:20-cv-2238-VMC-JSS

MERCEDES-BENZ USA, LLC; DAIM-
LER AKTIENGESELLSCHAFT; RO-
BERT BOSCH LLC; and ROBERT
BOSCH GmbH,

     Defendants.

---

**DEFENDANTS MERCEDES-BENZ USA, LLC AND**
**DAIMLER AKTIENGESELLSCHAFT'S MOTION TO DISMISS**
**PLAINTIFF'S SECOND AMENDED COMPLAINT**
**AND INCORPORATED MEMORANDUM OF LAW**

Defendants Mercedes-Benz USA, LLC ("MBUSA") and Daimler Aktiengesell-

schaft ("Daimler") (collectively, "the Mercedes Defendants") respectfully move under

Federal Rule of Civil Procedure 12(b)(6) to dismiss Plaintiff's Second Amended Com-

plaint, D.E. 7.[1] Dismissal is warranted for four reasons: (i) the federal Clean Air Act

("CAA") preempts Plaintiff's attempt to enforce a standard relating to the control of

emissions from motor vehicles; (ii) Plaintiff fails to allege any facts regarding purported

tampering with vehicles after sale to customers; (iii) claims regarding certain Sprinter

vehicles fall outside Plaintiff's ordinances; and (iv) Plaintiff's own allegations of public

---

[1] Citations to "D.E.__" refer to docket entries in this case.

events and reports on the Mercedes Defendants' alleged conduct show that its claims are time-barred.

## I.     INTRODUCTION

This lawsuit is an overreaching attempt by a local regulator to use a tampering ordinance to impose monetary and injunctive sanctions on a vehicle manufacturer for an alleged "defeat device scheme" that the U.S. Environmental Protection Agency ("EPA") already investigated and settled without any admission of wrongdoing. Plaintiff alleges that, between 2007 and 2016, the Mercedes Defendants "dupe[d] the United States Environmental Protection Agency" by "manufacturing and installing defeat devices" in certain diesel vehicles, causing them "to be in non-compliance with EPA regulations." D.E. 7, ¶ 1. But Plaintiff's claim that this alleged conduct *also* violated its ordinance prohibiting "tampering" with vehicle emission control systems ([Environmental Protection Commission ("EPC") Rule § 1-8.05(1)](#)) is squarely preempted because federal law is the primary source of vehicle manufacturers' emission compliance obligations, and only federal regulators can enforce those obligations—as EPA has done already. Plaintiff's attempt to bring defeat-device claims against an overseas automobile *manufacturer* and its U.S. *distributor* under an ordinance that regulates tampering by vehicle *operators* should be dismissed with prejudice.

*First*, Section 209(a) of the CAA expressly preempts Plaintiff's claims related to the alleged manufacture and installation of defeat devices before the vehicle is sold—so called "pre-sale" tampering claims—which are the core of Plaintiff's Complaint. By its express terms, Section 209(a) prohibits state and local regulators from adopting or

2

attempting to enforce any standard relating to the control of emissions from new vehicles. That provision reflects Congress's choice to vest EPA with exclusive power to regulate manufacturers' compliance with vehicle emission standards and to avoid a patchwork of state and local vehicle emission regulations. Every court to consider the issue has held that Section 209(a) expressly preempts claims related to the pre-sale manufacture and installation of defeat devices. This Court should do the same.

Federal law also preempts Plaintiff's vague and conclusory claim for post-sale tampering through unspecified "field fixes and recall campaigns." Section 209(a) expressly preempts that claim because Plaintiff seeks to regulate vehicle manufacturer conduct that relates to the pre-sale design and installation of emission control systems in vehicles sold in the United States. In addition, principles of conflict preemption independently bar Plaintiff's attempt to stretch a local tampering ordinance that regulates vehicle owner conduct to cover vehicle design and engineering decisions made by automobile manufacturers.

*Second*, even if post-sale tampering claims were not preempted, Plaintiff has failed to plead facts stating a plausible post-sale tampering claim. Plaintiff makes a single conclusory allegation that the Mercedes Defendants tampered with vehicles "through a program of newly created field fixes and recall campaigns," but alleges no facts regarding the timing of such campaigns, their purpose or effect, or even the vehicles involved.

*Third*, Plaintiff fails to state a tampering claim for model year 2010–2016 Sprinter 3500 CDI vehicles because Plaintiff does not allege facts showing the ordinance at issue covers these vehicles; their certified weight is too heavy.

*Fourth*, the applicable four-year statute of limitations bars Plaintiff's claims. Plaintiff's allegations center on the design and manufacture of model year 2007–2016 vehicles, and Plaintiff alleges no specific actionable conduct after those years. Plaintiff's Complaint admits that several public reports identified the alleged conduct at issue more than four years before this lawsuit was filed, thereby refuting Plaintiff's conclusory assertion that it could not have brought this lawsuit sooner. Plaintiff's inexcusable delay is a textbook ground for dismissal.

## II.   BACKGROUND

### A.   Federal Regulation Of Motor Vehicle Emissions.

Section 209(a) of the CAA broadly preempts state and local laws that "adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines." 42 U.S.C. § 7543(a).[2] This preemption is a "cornerstone" of the CAA. *Engine Mfrs. Ass'n v. U.S. EPA*, 88 F.3d 1075, 1079 (D.C. Cir. 1996) ("*EMA*"). Congress recognized that "the possibility of 50 different state reg-

---

[2] The CAA grants California unique authority to seek waivers of preemption from EPA and enforce its own standards relating to the control of emissions from new motor vehicles alongside EPA. *See* 42 U.S.C. § 7543(b). Other states may adopt California's standards in lieu of the federal standards but no other unique state or local regulation is allowed. *See id.* §§ 7507, 7543(b). Plaintiff does not purport to enforce California's standards, nor could it: The State of Florida has not adopted the California regime. Accordingly, this motion focuses on the federal regulatory framework.

ulatory regimes 'raised the spectre of an anarchic patchwork of federal and state regulatory programs, a prospect which threatened to create nightmares for the manufacturers.'" *Id.*

The CAA gives EPA comprehensive authority to set and regulate vehicle manufacturers' compliance with emission standards. *See, e.g.*, 42 U.S.C. §§ 7521 (emission standards), 7525 (testing and certification), 7541 (in-use regulation, warranties, and recalls). Prior to a vehicle's initial sale, manufacturers must obtain a Certificate of Conformity from EPA—a process that involves emissions testing, disclosure of relevant emissions-related components and functions, and compliance with the agency's defeat device prohibition. *Id.* § 7522(a)(1); 40 C.F.R. §§ 86.1844-01, 86.1848-01. EPA's authority also includes the power to prohibit manufacturer pre- and post-sale tampering and to bring enforcement actions for violations at any time. *See* 42 U.S.C. § 7522(a)(3)(A). EPA requires manufacturers to report changes made to emission-related components or to remedy emission-related defects in post-sale vehicles in the field (via "field fixes" or recalls). EPA has issued guidance to manufacturers on how to implement changes in the field without violating the CAA's prohibition on tampering. *See* EPA, MSAPC ADVISORY CIRCULAR 2B, FIELD FIXES RELATED TO EMISSION CONTROL-RELATED COMPONENTS (Mar. 17, 1975) ("EPA Advisory Circular 2B").

To monitor vehicles' post-sale compliance with federal emission regulations, EPA must promulgate emission standards that are "applicable to such vehicles and engines for their useful life." 42 U.S.C. § 7521(a)(1). Manufacturers must comply with certification and in-use standards "both during and after model year production." 40

C.F.R. § 86.1848-01(c)(2). Congress recognized that emission standards "will have little impact if we cannot assure compliance with those standards over the useful life of those vehicles." 116 CONG. REC. 42,385 (1970). EPA therefore requires manufacturers to conduct comprehensive "in-use verification testing" to determine whether vehicles "in actual use" comply with the relevant emission standards. 42 U.S.C. § 7541(b); 40 C.F.R. § 86.1845-04. Manufacturers must provide information to EPA to show that they are "acting in compliance" with this and other CAA provisions. 42 U.S.C. § 7542(a). States, in contrast, are expressly prohibited from requiring any "new motor vehicle manufacturer or dealer" to "conduct testing" "after the date of sale of such vehicle to the ultimate purchaser." *Id.* § 7541(h)(2).

Under federal regulations, manufacturers must track emission-related defects and file "emission defect information reports" for five years following a given model year. *See* 40 C.F.R. §§ 85.1901, 85.1903. Such reports inform EPA of defects to parts that "must function properly to ensure continued compliance with emission standards." *Id.* § 85.1902. The CAA also requires manufacturers to provide emission control warranties that must remain in effect long after vehicles are sold to consumers. *See* 42 U.S.C. § 7541(a), (i). States, in contrast, are prohibited from requiring manufacturers to provide emission-control warranties or report emission-related defects. *See id.* § 7543(a).

Manufacturers also must notify EPA of voluntary emission recalls and describe, among other things, each "class or category of vehicle or engine recalled." 40 C.F.R.

§ 85.1904. In addition, EPA must require manufacturers to recall vehicles upon deter-

mining that "a substantial number of a class or category of vehicles" do not conform

to emission regulations. 42 U.S.C. § 7541(c); 40 C.F.R. § 85.1802. States, in contrast,

may not require such recalls. *See* Air Pollution Control; Preemption of State Regula-

tion for Nonroad Engine and Vehicle Standards, 59 Fed. Reg. 36,969, 36,973 n.15

(July 20, 1994) (providing that because recall programs "relate to the original manu-

facture of the engine and place the burden of compliance upon the manufacturer, they

are deemed to be standards affecting a new motor vehicle or a new nonroad engine"

subject to exclusive federal regulation).

This comprehensive federal authority reflects Congress's intent to broadly

preempt state regulation of pre-sale and in-use emission compliance for vehicle and

engine manufacturers "in order to prevent a chaotic situation from developing in in-

terstate commerce in new motor vehicles." H.R. REP. NO. 90-728 (1967), *as reprinted

in* 1967 U.S.C.C.A.N. 1938, 1956.

### B.    EPA's Settlement With The Mercedes Defendants.

In 2020, the Mercedes Defendants entered into consent decrees with EPA and

the California Air Resources Board ("CARB") resolving claims related to its BlueTEC

II diesel vehicles. *See* Consent Decree, *United States v. Daimler AG, et al.*, No. 1:20-cv-

02564 (D.D.C. Sept. 14, 2020) ("EPA Consent Decree"), Daimler Aktiengesellschaft

and Mercedes-Benz USA, LLC's Motion for Judicial Notice ("MJN") Exs. 2–3; Con-

sent Decree, *People of the State of California v. Daimler AG, et al.*, No. 1:20-cv-02565

(D.D.C. Sept. 14, 2020), MJN Exs. 4–5. As memorialized by the consent decrees, the

Mercedes Defendants deny the allegations against them, but agreed to undertake an Emission Modification Program to update the vehicles, implement corporate compliance measures, pay a civil penalty, and administer an environmental mitigation program. EPA Consent Decree at 2, ¶¶ 8, 18, 20–41. The EPA Consent Decree broadly resolved all claims for: (1) the violations alleged, including tampering prohibited by the CAA; (2) "violations arising from or relating to the software, calibrations, and/or functions of the emission control system, combustion system, and transmission system for" the vehicles at issue; and (3) "violations arising from or relating to [Daimler's] applications for a certificate of conformity for the [vehicles at issue] and any information provided to EPA for the purpose of securing such certificates." *Id.* ¶ 86.

## C.   Plaintiff's Duplicative Action.

Shortly after the settlement with EPA and CARB, on September 24, 2020, Plaintiff filed a duplicative complaint for damages and injunctive relief against the Mercedes Defendants, as well as Robert Bosch LLC and Robert Bosch GmbH, the alleged supplier of emission control technology for the vehicles at issue in its complaint (the "Affected Vehicles"). *See* D.E. 1. Two amended complaints followed. D.E. 3, 7. Plaintiff alleges that the Mercedes Defendants violated EPC Rule § 1-8.05(1), which provides: "No person shall tamper, cause, or allow the tampering of the emission control system of any motor vehicle." According to Plaintiff, the Mercedes Defendants tampered with "the emission control systems of Affected Vehicles registered in Hillsborough County" by "manufacturing and installing defeat devices in Affected Vehicles

registered in Hillsborough County," and by carrying out unspecified "field fixes and recall campaigns." D.E. 7, ¶¶ 89–90.

## III.   ARGUMENT

### A.   The CAA Preempts Plaintiff's Claims.

Section 209(a) of the CAA broadly preempts state and local laws that "adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines." 42 U.S.C. § 7543(a). Plaintiff itself acknowledges—as it must—that "Congress displaced state emission standards for new motor vehicles in 1967." *See* D.E. 7, ¶ 30 n.16. Two forms of preemption operate here: express preemption and implied conflict preemption. Under the doctrine of express preemption, "Congress may explicitly define the extent to which it intends to preempt state law." *Sims v. State of Fla., Dep't of Highway Safety & Motor Vehicles*, 862 F.2d 1449, 1454 (11th Cir. 1989) (internal quotation marks omitted). Section 209(a), by its plain text, expressly preempts state laws that purport to regulate emission standards for new motor vehicles. In addition, under the doctrine of implied conflict preemption, Congress may "preempt state law to the extent that the state law actually conflicts with federal law." *Id.* Conflict preemption also occurs "when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objective of Congress." *United States v. Locke*, 529 U.S. 89, 109 (2000) (internal quotation marks

omitted). Plaintiff's claims for pre-sale and post-sale tampering implicate both forms of preemption.[3]

### 1.   Plaintiff's Pre-Sale Tampering Claims Are Expressly Preempted.

The crux of Plaintiff's Complaint is that the Mercedes Defendants allegedly "designed," "manufactured," and "installed" defeat devices in the Affected Vehicles prior to their sale. *See, e.g.*, D.E. 7, ¶¶ 13, 15–16, 19, 37–38, 69, 70, 71, 74. These pre-sale tampering claims impermissibly attempt to enforce a "standard relating to the control of emissions from new motor vehicles or new motor vehicle engines." 42 U.S.C. § 7543(a). The Supreme Court has defined a "standard" as "that which 'is established by authority, custom, or general consent, as a model or example; criterion; test.'" *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252–53 (2004). "The criteria referred to in § 209(a) relate to the emission characteristics of a vehicle or engine." *Id.* at 253. They are not limited merely to numerical emission levels; rather, to meet such criteria, "the vehicle or engine must not emit more than a certain amount of a given pollutant, must be equipped with a certain type of pollution-control device, or must have some other design feature related to the control of emissions." *Id.* Thus, the CAA expressly bars states from requiring that vehicles contain certain pollution-

---

[3] When a statute contains an express preemption clause, as Section 209(a) does, courts "do not invoke any presumption against pre-emption but instead 'focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent.'" *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 136 S. Ct. 1938, 1946 (2016). A presumption against preemption also does not apply where, as here, a state "regulates in an area where there has been a history of significant federal presence." *Locke*, 529 U.S. at 108; *see generally* Part II.A, *supra*.

control devices or that they *not* contain defeat devices, including through pre-sale tampering prohibitions. *See In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, 264 F. Supp. 3d 1040, 1052 (N.D. Cal. 2017) ("*Wyoming*").

Every court to consider the issue to date has held that the CAA preempts pre-sale tampering claims (including defeat device claims). *See id.* at 1052 (setting forth reasoning relied on by a number of other courts).[4] Moreover, the U.S. Court of Appeals for the Ninth Circuit recently held that enforcement of EPC Rule § 1-8.05(1) with respect to pre-sale tampering claims is expressly preempted. *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, 959 F.3d 1201, 1217–18 (9th Cir. 2020) ("*Volkswagen II*"), *cert. pet. filed*, No. 20-994 (U.S. Jan. 21, 2021). This Court likewise should dismiss with prejudice Plaintiff's pre-sale tampering claims because they are expressly preempted.[5]

---

[4] *See also State v. Volkswagen AG*, No. CV-2016-903390.00, 2017 WL 6551054, at *11 (Ala. Cir. Ct. Dec. 19, 2017), *aff'd*, 279 So. 3d 1109 (Ala. 2018) ("*Alabama*"); *People, ex rel. Madigan v. Volkswagen Aktiengesellschaft*, No. 16 CH 14507, 2018 WL 3384883, at *10–11 (Ill. Cir. Ct. June 5, 2018) ("*Illinois*"); *State v. Volkswagen Aktiengesellschaft*, No. 27-CV-16-17753, 2018 WL 1660911, at *5 (Minn. Dist. Ct. Mar. 12, 2018), *aff'd in part, rev'd in part, State by Swanson v. Volkswagen Aktiengesellschaft*, No. A18-0544, 2018 WL 6273103 (Minn. Ct. App. Dec. 3, 2018) ("*Minnesota*"); *State v. Volkswagen Aktiengesellschaft*, No. 1622-CC10852-01, 2018 WL 3349094, at *3 (Mo. Cir. June 26, 2018) ("*Missouri*"); *State, ex rel. DeWine v. Volkswagen Aktiengesellschaft*, No. 16CV1010206, 2018 WL 8951077, at *6 (Ohio Com. Pl. Dec. 07, 2018), *rev'd, State ex rel. Yost v. Volkswagen Aktiengesellschaft*, 137 N.E.3d 1267 (Ohio Ct. App. 2019) ("*Ohio*"), *appeal allowed*, 158 Ohio St. 3d 1450 (2020); *State ex rel. Slatery v. Volkswagen Aktiengesellschaft*, No. M2018-00791-COA-R9-CV, 2019 WL 1220836 at *8–9 (Tenn. Ct. App. Mar. 13, 2019) ("*Tennessee*").

[5] The CAA also impliedly preempts Plaintiff's pre-sale tampering claims for the same reasons explained in Part III.A.2, *infra*.

### 2.   Plaintiff's Post-Sale Tampering Claims Are Also Preempted.

Plaintiff also asserts post-sale tampering claims based on unspecified "field fixes and recall campaigns," D.E. 7, ¶ 90. As discussed further in Part III.B, *infra*, Plaintiff has not adequately pleaded facts to support a post-sale tampering claim against the Mercedes Defendants, but even if it had, such claims are also preempted by the CAA, as recognized by the majority of courts to consider the issue to date. Accordingly, Plaintiff's post-sale tampering claims should be dismissed with prejudice.

As an initial matter, there is no legal significance in the distinction between the regulation of manufacturer changes to vehicle emissions systems "pre-sale" and "post-sale," because EPA indisputably regulates *both*. For example, manufacturers routinely modify vehicles before and after sale through running changes (changes during vehicle production) and field fixes (changes made after vehicle production). *See* 40 C.F.R. § 86.1803-01 (defining "running change"); EPA Advisory Circular 2B at 1 (defining "field fix"). EPA regulates such changes the same way—it requires manufacturers to disclose such changes, comply with federal emission standards, and refrain from using defeat devices. *See* 42 U.S.C. § 7522(a)(3); 40 C.F.R. §§ 86.1842-01(b), 86.1844-01(f), 86.1848-10(c)(6); EPA Advisory Circular 2B. EPA also decides whether such changes are lawful or whether they may be considered tampering or defeat devices under the CAA. *See* 42 U.S.C. § 7522(a)(3); EPA Advisory Circular 2B. Manufacturers engineer both running changes and field fixes, and both types of changes "relat[e] back to the original design of the engine by the original engine manufacturer" by altering the original design. *See* 59 Fed. Reg. at 36,974. Accordingly, even manufacturers' post-sale

modification of emission control systems falls under the authority of federal regulators applying federal law.

> **a.   Plaintiff's Post-Sale Tampering Claims Are Expressly Preempted Because They Relate To The Mercedes Defendants' Original Vehicle Design.**

Plaintiff's Complaint attempts to stretch a local tampering ordinance designed to regulate *individual vehicle operators* to cover *vehicle manufacturer* conduct related to the original design and installation of emission control systems in vehicles sold throughout the United States. The CAA, however, expressly preempts this interpretation.

The CAA's preemption provision reaches "*any standard relating to* the control of emissions from new motor vehicles or new motor vehicle engines." 42 U.S.C. § 7543(a) (emphasis added). Courts have observed that the language "related to" "express[es] a broad pre-emptive purpose," *Morales v. Trans World Airlines*, 504 U.S. 374, 383 (1992), and "indicates Congress' intent to pre-empt a large area of state law," *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008). Courts have specifically characterized Section 209(a) as "sweeping" and have found "the phrase 'relating to' evinces an 'expansive' intent." *Jackson v. Gen. Motors Corp.*, 770 F. Supp. 2d 570, 575–76 (S.D.N.Y. 2011), *aff'd sub nom.*, *Butnick v. Gen. Motors Corp.*, 472 F. App'x 80 (2d Cir. 2012). The second sentence of Section 209(a) reinforces the broad scope of preemption, providing that "[n]o State shall require certification, inspection, or any other approval relating to the control of emissions from any new motor vehicle or new motor vehicle engine as condition precedent to the initial retail sale, titling (if any), or registration of such motor vehicle, motor vehicle engine, or equipment." 42 U.S.C. § 7543(a). Together, these

13

provisions compel the conclusion that "enforcement actions that have any 'connection with or reference to' the control of emissions from motor vehicles are preempted by § 209(a)." *Jackson*, 770 F. Supp. 2d at 577.

Section 209(a)'s use of the phrase "new motor vehicle or new motor vehicle engine" does not limit the scope of preemption to pre-sale conduct. *See Wyoming*, 264 F. Supp. 3d at 1053. Allowing states and localities to impose emission standards "the moment after a new car is bought and registered . . . would be an obvious circumvention of the CAA and would defeat the congressional purpose of preventing obstruction to interstate commerce." *Allway Taxi, Inc. v. City of New York*, 340 F. Supp. 1120, 1124 (S.D.N.Y.), *aff'd*, 468 F.2d 624 (2d Cir. 1972). EPA has relied on the reasoning of *Allway Taxi* to conclude that states may not implement "standard[s] relating back to the original design of the engine by the original engine manufacturer." 59 Fed. Reg. at 36,974.

*In re Office of Attorney General of State of New York*, 269 A.D.2d 1 (N.Y. 2000) also is instructive. EPA had investigated manufacturers of heavy-duty diesel engines for using defeat devices and ultimately resolved the matter in a federal consent decree. *Id.* at 3. The New York Attorney General later issued subpoenas to the manufacturers seeking to investigate their engines' "in-use [i.e., post-sale] emissions." *Id.* at 4. The trial court quashed the subpoenas and the court of appeals affirmed, explaining that "the Attorney General's claims concerning 'in-use emissions'" were preempted because they "target[ed] the manufacturers' practice of producing diesel engines purportedly designed to skirt Federal emissions standards." *Id.* at 9–10.

As these authorities illustrate, Section 209(a) broadly preempts state efforts to require manufacturers to equip their vehicles with any particular pollution-control devices or regulate the implementation of post-sale changes that relate back to the manufacturer's original design of the vehicle. Nevertheless, Plaintiff impermissibly attempts to regulate in this federally preempted area by interpreting its tampering ordinance to cover a manufacturer's adjustments to a vehicle's emissions control system during "field fixes and recall campaigns." *See* D.E. 7, ¶ 90. In other words, Plaintiff seeks to regulate a manufacturer's emissions control system modifications to ensure compliance with federal regulations, thus interfering with its ability to make nationwide post-sale updates. Plaintiff's overreaching interpretation runs headlong into federal preemption. Enforcing such a requirement directly relates to pre-sale design and engineering decisions by automobile manufacturers, because if states and localities could enforce their own emission standards, manufacturers would need to account for that additional source of state-law regulation when making their original design decisions. Plaintiff's novel interpretation of its tampering ordinance therefore is expressly preempted. *See Sims*, 862 F.2d at 1455.

> **b.    Plaintiff's Post-Sale Tampering Claims Are Impliedly Preempted Because They Conflict With The CAA.**

In addition to Section 209(a)'s express preemption provision, the CAA's structure and purpose demonstrate that application of state post-sale tampering laws to manufacturers would stand as an obstacle to the accomplishment and execution of the

full purposes and objective of Congress, providing an independent basis for preemption. *See Locke*, 529 U.S. at 109. Under the CAA, EPA, not states or localities, has the authority to regulate such manufacturer conduct. And, allowing states or localities to regulate this conduct as Plaintiff attempts to do would result in conflicting regulatory programs and obligations, paralyzing the ability of manufacturers to implement beneficial or necessary recalls and field fixes.

*First*, permitting state or local post-sale tampering claims would run contrary to the CAA's structure. As described in Part II.A, *supra*, the CAA gives EPA alone the comprehensive authority to regulate manufacturer compliance with emission standards both before and after sale for a vehicle's "useful life" through tampering regulations and through enduring emission standards, in-use testing, emission-related defect tracking and reporting, and warranty requirements. The same is true of field fixes and recalls, which manufacturers must conduct pursuant to EPA regulations and guidance. *See* EPA Advisory Circular 2B; 40 C.F.R. §§ 85.1802, 85.1803, 85.1904.

In contrast, state and local governments serve a different function under the CAA—they regulate the use of vehicles on an individual basis. *See* Part III.A.3, *infra*; *Tennessee*, 2019 WL 1220836, at *12. States may develop inspection and maintenance programs, *see* 42 U.S.C. § 7544, to ensure that vehicles "continue to conform to the standards for which they were certified." S. REP NO. 91–1196, at 31 (1970). Those programs regulate *individuals*, not manufacturers. State inspection programs "cause proper maintenance to be observed *by the motorists*" and subject vehicle *owners* to sanc-

16

tions if their vehicles fall below the standards. *See* 116 CONG. REC. 42,385 (1970) (emphases added). A state may deny registration to the owner of a vehicle that fails an inspection, *see* 42 U.S.C. § 7511a(a)(2)(B)(ii), (c)(3)(C)(iv), but a state may *not* require manufacturers to conduct in-use testing, *see id.* § 7541(h)(2). States also may permissibly require other individual vehicle-focused in-use regulations such as "carpool lanes, restrictions on car use in downtown areas, and programs to control the extended idling of vehicles." *EMA*, 88 F.3d at 1094; *see also Jackson*, 770 F. Supp. 2d at 577 (noting the permissibility of "state regulations of the use or operation of motor vehicles subsequent to their sale (e.g., access to certain lanes of traffic, engine idling rules)"). Each of these permissible forms of state regulation centers on a state's regulation of its *citizens*, whereas the regulation of *manufacturers* is a matter of interstate commerce falling within the federal sphere. EPA itself has acknowledged this dichotomy, finding that in contrast to preemption of emission standards, "there is generally no federal preemption of state initiatives related to the way *individuals use individual engines or vehicles.*" Control of Emissions From Nonroad Large Spark Ignition Engines and Recreational Engines (Marine and Land-Based), 66 Fed. Reg. 51,098, 51,102 (proposed Oct. 5, 2001) (emphasis added).

Legislative history confirms that Congress intended this division between federal regulation of manufacturers and state regulation of individuals. In 1967, Congress, in addressing the authority of the states under the CAA, noted that the "areas in which States and local government can be most effective" are areas implicating the use of

vehicles: "control of the movement of vehicles"; "alternative methods of transportation"; reductions to "commuter traffic"; and "control of used vehicles." S. REP. NO. 90-403, at 34 (1967). Similarly, in 1970, Congress found that the preemption provision would not "infringe the ability of a State or community to regulate *the use of* any vehicle once it has been purchased." S. REP. NO. 91–1196, at 32 (1970). And in 1990, Congress expanded the reach of the federal tampering prohibition specifically so that it could "supplement state efforts to regulate tampering *by individual vehicle owners and operators*." *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, 310 F. Supp. 3d 1030, 1043 (N.D. Cal. 2018) (citing S. REP. NO. 101–228, at 123 (1989)) (emphasis added), *aff'd in part, rev'd in part*, 959 F.3d 1201 (9th Cir. 2020).

Accordingly, states and localities may not impose regulations that would "defeat the congressional purpose of preventing obstruction to interstate commerce." *Allway Taxi*, 340 F. Supp. at 1124 (cited with approval by EPA at 59 Fed. Reg. at 36,973). Rather, states and localities may impose regulations that "would cause only minimal interference with interstate commerce," i.e., where "they would be directed primarily to intrastate activities *and the burden of compliance would be on individual owners and not on manufacturers and distributors*." *Id.* (emphasis added). Applying Plaintiff's tampering ordinance to an overseas manufacturer for alleged noncompliance with emissions standards would conflict with authority that the CAA reserves for federal regulators. *See Illinois*, 2018 WL 3384883, at *16–18; *Minnesota*, 2018 WL 6273103, at *9.

*Second*, applying state and local tampering laws to vehicle manufacturers would conflict with a central purpose of the CAA. Under the CAA, vehicle manufacturers

may make changes to post-sale vehicles through updates implemented via field fixes and/or voluntary emission recalls. *See* EPA Advisory Circular 2B (regarding field fixes); 40 C.F.R. § 85.1904 (regarding voluntary emission recalls).[6] In certain circumstances, EPA must *require* a manufacturer recall. *See* 40 C.F.R. § 85.1802. EPA alone has the authority to oversee these manufacturer-implemented post-sale changes. *See, e.g.*, *id.* § 85.1904 (requiring submission of voluntary emission recall reports and quarterly reports to EPA), *id.* §§ 85.1802–85.1803 (requiring submission of remedial plans for EPA approval); EPA Advisory Circular 2B (providing procedures for reporting and seeking approval of field fixes). In regulating field fixes, EPA recognizes that such changes may implicate tampering prohibitions. *See* EPA Advisory Circular 2B. These post-sale changes are commonplace. In 2017 alone, manufacturers reported 102 recalls, affecting more than 5 million vehicles and engines. *See* EPA, 2014-2017 Progress Report Vehicle & Engine Compliance Activities 7 (Apr. 2019).

In its sole allegation of post-sale conduct, Plaintiff alleges that the Mercedes Defendants violated its tampering ordinance "through a program of newly created field fixes and recall campaigns," D.E. 7, ¶ 90, but manufacturer field fixes and recall campaigns fall under federal authority. Permitting enforcement of state or local tampering laws against manufacturers implementing nationwide field fixes or national recall campaigns would result in the "anarchic patchwork of federal and state regulatory

---

[6] Field fixes are "modification[s], removal[s] or replacement[s] of an emission-control related component by a manufacturer or dealer, or revision by a manufacturer for implementation by dealers to specifications or maintenance practices for emission-control related components on vehicles that have left the assembly line." EPA Advisory Circular 2B at 1.

programs" that Congress sought to avoid. *EMA*, 88 F.3d at 1079; *see also Metro. Taxicab Bd. of Trade v. City of New York*, 633 F. Supp. 2d 83, 104 (S.D.N.Y. 2009), *aff'd*, 615 F.3d 152 (2d Cir. 2010). If states can enforce such laws, manufacturers seeking to implement field fixes and recalls will need not only to comply with EPA regulations governing such changes, but also with the regulations of countless states and municipalities. State law would be an obstacle to the accomplishment and execution of the CAA's full purposes and objectives. *See In re Office of Attorney Gen. of State of New York*, 269 A.D.2d at 7–8 (Congress sought "to circumvent a situation where automobile and engine manufacturers would have to comply with different and, more likely than not, inconsistent State regulatory schemes."); *cf. Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 348 (2001) (finding conflict preemption where "[a]s a practical matter, complying with the FDA's detailed regulatory regime in the shadow of 50 States' tort regimes will dramatically increase the burdens facing potential applicants").

Variations in how states and localities define "tampering" exacerbate the conflict with the CAA's purposes. Plaintiff, for example, purports to prohibit any "intentional inactivation, disconnection, removal or other modification" that results in an emission control system whose "operation or efficiency has been circumvented, defeated, or deleteriously affected." EPC Rule § 1-8.01(2). Florida's definition of "tampering," on the other hand, differs from Plaintiff's ordinance and contains several statutory exemptions. *See* FLA. STAT. § 316.2935 (2000). Moreover, other states and localities use their own terms and definitions. For example, Minnesota purports to provide more broadly that "a person may not knowingly tamper with, adjust, alter,

change, or disconnect any air pollution control system," and does not define the word "tamper." MINN. STAT. § 325E.0951.[7] If courts were to apply such provisions to federally regulated field fixes and recall campaigns, as Plaintiff seeks to do, it would result in differing duties and liability in different states and different localities for vehicles that can (and do) cross state lines. *See Metro. Taxicab Bd. of Trade*, 633 F. Supp. 2d at 104 ("Congress was concerned about the possibility of 50 different standards applying to one vehicle that so easily moves across state lines.").

Applying local tampering laws in these circumstances also would result in interpretations that differ in material respects from federal regulations that govern post-sale changes.[8] EPA has the authority to allow post-sale changes that involve emission tradeoffs—an increase in one pollutant for a decrease in another. For example, EPA has recognized that "diesel technology typically results in increased PM (and HC) emissions when NOX emissions are reduced." Control of Air Pollution From Heavy-Duty Engines, 60 Fed. Reg. 45,580, 45,580 (Aug. 31, 1995). Applying local tampering laws to determine such tradeoffs would conflict with federal objectives. As noted in

---

[7] In addition, the Minnesota Pollution Control Agency's air pollution control systems restrictions rule broadly states "[n]o person shall remove, alter, or otherwise render inoperative any air pollution control system," but does not define the term "inoperative." MINN. R. 7023.0120 (2014). The Minnesota Court of Appeals held that the State of Minnesota's attempted enforcement of these provisions against Volkswagen for alleged post-sale tampering was preempted. *Minnesota*, 2018 WL 6273103, at *6–10.

[8] For example, EPA permits devices that reduce the effectiveness of an emission control system when "justified in terms of protecting the vehicle against damage or accident." 40 C.F.R. § 86.1803-01. EPA has issued guidance documents interpreting this exception, which may or may not be adopted by states or localities attempting to enforce tampering laws. *See, e.g.*, EPA, MSAPC ADVISORY CIRCULAR 24, PROHIBITION OF USE OF EMISSION CONTROL DEFEAT DEVICES (Dec. 11, 1972).

the context of the Federal Communications Act, which also requires uniform regula-

tion, "[w]hen Congress charges an agency with balancing competing objectives, it in-

tends the agency to use its reasoned judgment to weigh the relevant considerations and

determine how best to prioritize between these objectives. Allowing state law to im-

pose a different standard permits a re-balancing of those considerations." *Farina v.*

*Nokia Inc.*, 625 F.3d 97, 123 (3d Cir. 2010). If state and local tampering laws were

enforced against manufacturers, conduct approved by EPA could still subject a man-

ufacturer to penalties until it "altered the vehicles to the State's satisfaction," which

"would be no different than if the State were to insert itself into the model-wide, in-

use testing and recall process." *Tennessee*, 2019 WL 1220836, at *13.[9]

For these reasons, application of a locality's tampering laws to manufacturers'

post-sale field fixes and recall campaigns would conflict with the purposes of the CAA.

*Cf. Buckman*, 531 U.S. at 351 (finding conflict preemption where "fraud-on-the-FDA

claims would also cause applicants to fear that their disclosures to the FDA, although

deemed appropriate by the Administration, will later be judged insufficient in state

court"); *Farina*, 625 F.3d at 122–26 (finding conflict preemption existed when a jury

could find state law liability based on FCC-compliant cell phones). Such conflict

would be present even if Plaintiff's ordinances were identical to federal standards. *See*

---

[9] Plaintiff purports to seek statutory penalties of up to $5,000 per offense per day, D.E. 7, ¶¶ 9, 91 giving a single county outsized ability to interfere in nationwide resolutions. It also seeks injunctive relief in the form of an order "directing the Defendants to permanently, expeditiously, and completely repair the Affected Vehicles," *id.* ¶ 95—vehicles which are required to be updated according to highly detailed specified procedures enumerated in the EPA Consent Decree, *see* EPA Consent Decree Section VI (Subject Vehicle Compliance).

*Sims*, 862 F.2d at 1455 (finding preemption of a state statute that "simply ensure[d] that new motor vehicles coming onto Florida's highways compl[ied] with the Clean Air Act" and did "not establish new or conflicting emission standards"); H.R. REP. No. 90-728, *as reprinted in* 1967 U.S.C.C.A.N. 1938, 1957 ("[I]dentical Federal and state standards, separately administered, would be difficult for the industry to meet since different administrations could easily lead to different answers to identical questions."). The CAA therefore impliedly preempts Plaintiff's tampering ordinances as applied to any manufacturer post-sale field fixes and recalls. *See Illinois*, 2018 WL 3384883, at *18.

### c. The Weight Of Authority Has Found That Post-Sale Tampering Claims Are Preempted.

Although Plaintiff's Complaint relies on a single Ninth Circuit decision involving tampering allegations against Volkswagen, a majority of courts have held the post-sale tampering claims based on similar allegations against Volkswagen are preempted. The Supreme Court of Alabama found that allowing states to proceed with post-sale tampering claims "would stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Alabama*, 279 So. 3d at 1129. The Tennessee Court of Appeals acknowledged that even though a state action would "have a strong deterrent effect and further the federal Clean Air Act's purposes and objectives by reducing air pollution," it is nevertheless "clear from the federal Clean Air Act's legislative history, structure, and plain language that Congress intended to

[curb air pollution] in an efficient and cost-effective manner to protect interstate commerce." *Tennessee, 2019 WL 1220836, at *13*. The Minnesota Court of Appeals held that "Congress, by enacting the CAA, provided that the federal government—rather than state or local governments—regulate [post-sale tampering]." *Minnesota, 2018 WL 6273103, at *10*. And other courts have reached the same conclusion. *See Illinois, 2018 WL 3384883, at *19*; *Missouri, 2018 WL 3349094, at *3*.[10]

The recent decision by the Ninth Circuit is contrary to this weight of authority, but the Ninth Circuit acknowledged that its decision was "caused by the unusual and perhaps unprecedented situation" of Volkswagen's "unexpected and aberrant conduct." *Volkswagen II, 959 F.3d at 1206*. That conduct concerned two 2014 post-sale software updates identified in the expert agencies' complaints against Volkswagen pursuant to which the company installed software that allegedly improved the functioning of its defeat devices. *See id. at 1206, 1208*. Even if such manufacturer conduct could fall within the reach of local regulators, no such conduct is alleged here. Plaintiff has not alleged any facts relating to post-sale tampering by the Mercedes Defendants, and certainly none that increased emissions in Hillsborough County or elsewhere.

Additionally, the Ninth Circuit's errant conclusion that such manufacturer conduct could fall within the reach of state and local regulators was based in part on the

---

[10] *But see Ohio, 137 N.E.3d at 1274–77*; Order, *Montana Dept. of Env. Quality v. Volkswagen Aktiengesellschaft*, Cause No. DDV-2016-1045 (Mont. Dist. Ct. Feb. 21, 2020) (declining to dismiss claims as preempted in a non-final decision); Order Granting in Part and Denying in Part Volkswagen and Porsche Defendants' Motion for Summary Judgment and Special Exceptions, *In re Volkswagen Clean Diesel Litigation: TCAA Enforcement Case*, No. D-1-GN-16-000370 (Dist. Ct. Travis County Apr. 11, 2018) (denying summary judgment on post-sale tampering claims in an order with no reasoning).

incorrect speculation that post-sale conduct like Volkswagen's "could not have been anticipated by Congress" when it enacted the CAA. *See id. at 1225*. In fact, Congress in 1970 explicitly anticipated the sort of conduct alleged against Volkswagen by making it unlawful "for any manufacturer or dealer knowingly to remove or render inoperative any such [emission control] device or element of design after such sale and delivery to the ultimate purchaser." Clean Air Act Amendments of 1970, Pub. L. No. 91-604, § 7(a)(3), 84 Stat. 1676, 1693. In any event, unexpected conduct by regulated parties or an unexpected outcome is not a reason for courts to limit unambiguous statutes to cover only anticipated conduct. *See, e.g.*, *Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731, 1751 (2020) (finding that refusal to apply a statute to unexpected circumstances would require courts to "abandon [their] role as interpreters of statutes"); *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998) (finding that whether Congress anticipated application of a statute to a specific circumstance is "irrelevant" when the statute is unambiguous).

The Eleventh Circuit has not yet encountered this issue, but it is likely to follow the weight of authority in rejecting the Ninth Circuit's erroneous construction of the CAA's preemption provision. This Court should, likewise, respectfully disagree with the Ninth Circuit's decision regarding post-sale tampering.

### 3.   The CAA Saving Clause Does Not Permit Plaintiff's Tampering Claims.

Plaintiff attempts to save its preempted claims by relying on the CAA saving clause, Section 209(d), which states, "[n]othing in this part shall preclude or deny to

25

any State or political subdivision thereof the right otherwise to control, regulate, or restrict the use, operation, or movement of registered or licensed motor vehicles," 42 U.S.C. § 7543(d). *See* D.E. 7, ¶ 67. Plaintiff alleges that "'operation' is defined as 'the quality or state of being functional or operative' or the 'method or manner of functioning,'" and that "[r]emoving or making inoperable a vehicle's emission control system (i.e., tampering) affects the vehicle's 'quality' and 'method' of functioning (i.e., operation)." *Id.* ¶ 68. Under Plaintiff's broad reading, a state or locality can enforce any law against a vehicle manufacturer for conduct that affects how a vehicle functions.

The CAA's saving clause does not go so far. Courts and the EPA have long interpreted the saving clause to be limited to regulations on how *owners* drive their cars, for example, via "carpool lanes, restrictions on car use in downtown areas, and programs to control extended idling of vehicles." *EMA*, 88 F.3d at 1094; *accord* S. REP. NO. 90-403, at 34 (1967). Ordinary principles of statutory construction warrant such an interpretation. The word "operation" in the saving clause appears in a list of terms; the immediately preceding and following terms "use" and "movement" both refer to ways in which a vehicle *owner* interacts with his or her vehicle, such as by driving it or idling it. *Cf. King v. Burwell*, 576 U.S. 473, 475 (2015) ("[W]ords of a statute must be read in their context and with a view to their place in the overall statutory scheme." (internal quotation marks omitted)). Further, the dictionary definition of "operate" at the time the language of Section 209(d) was enacted confirms that "when used with relation to automobiles, ['operate'] signifies a personal act in working the mechanism of the automobile." Operate, *Black's Law Dictionary* 1243 (4th ed. 1968). Manufacturers

26

do not "work the mechanism of the automobile" by making design and engineering decisions; rather, *owners* "work the mechanism of the automobile" by driving it.

This interpretation is also consistent with the background presumption that the federal government regulates interstate commerce, such as vehicle design and manufacturing decisions made overseas (as is the case here), while states regulate their citizens' intrastate conduct, such as the use and maintenance of registered vehicles. As discussed above, the CAA has long reflected this dichotomy by giving EPA comprehensive authority to regulate vehicle manufacturers. *See* Parts II.A, III.A.2, *supra*. The same division of authority is reflected in bedrock principles of federalism. *See Atlanta Gas Light Co. v. U.S. Dep't of Energy*, 666 F.2d 1359, 1366 n.10 (11th Cir. 1982) (acknowledging that the limitation on state authorities to regulate activities of interstate commerce is derived from "considerations of federalism that emanate from the system of government set up in the Constitution"). When construing ambiguous statutory terms, courts must presume that Congress legislated against background constitutional and common-law principles. *See Almendarez-Torres v. United States*, 523 U.S. 224, 238 (1998) (noting that courts must assume that Congress "legislates in light of constitutional limitations" (internal quotation marks omitted)).

EPA itself interprets Section 209(d) to apply narrowly to *owner* conduct. In paraphrasing Section 209(d), EPA considered the provision to permit states to regulate "use or movement" of vehicles. 59 Fed. Reg. at 36,973. EPA also characterized regulations promulgated pursuant to Section 209(d) as "operation controls," and remarked that "[i]n-use regulations, *such as time of use or place of use restrictions* (e.g. high occupancy

vehicle lanes) are typically very site specific," "primarily effect local users," and thus "are more appropriately controlled and implemented by local and state governments." *Id.* at 36,974 (emphasis added). Moreover, EPA noted that "certain state regulations that may be characterized as 'in-use' regulations may be preempted because they are effectively regulations on the design of new engines *rather than on the use of* 'in-use' engines." *Id.* (emphasis added). These statements further confirm that EPA, the expert federal agency charged with administering the CAA, historically has understood Section 209(d)'s saving clause to permit states to regulate only individuals' use of vehicles, not manufacturer decisions on the design of vehicle components.[11]

Accordingly, Plaintiff's sweeping interpretation of the saving clause is inconsistent with its plain text and ignores an essential purpose of the CAA to prevent obstruction of interstate commerce. The saving clause does not permit Plaintiff to apply its tampering ordinance here.

**B.  Plaintiff Fails To State A Claim Upon Which Relief Can Be Granted With Respect To Post-Sale Tampering.**

Plaintiff's post-sale tampering claims should be dismissed on the independent basis that Plaintiff has failed to allege facts sufficient to support those claims. Under Federal Rule of Civil Procedure 8, "a complaint must contain sufficient factual matter,

---

[11] The Ninth Circuit recently adopted a contrary interpretation of "operation," but in doing so, failed to apply principles of statutory interpretation and failed to consider the background principles of federalism reflected in the CAA's structure. *See Volkswagen II*, 959 F.3d at 1216. It also relied on a 2002 dictionary definition of "operation," *id.*, but failed to acknowledge the only definition in the same source that refers to vehicles: "the operating of or putting and maintaining in action of something (as a machine or an industry)," e.g., "careful [operation] of a motor car," *see* Operation, Webster's Third New International Dictionary 1518 (2002). The Ninth Circuit's construction of Section 209(d)'s saving clause is wrong and should not be followed.

accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* *556 U.S. 662, 678 (2009)* (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 *(2007)*). The "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 545. Conclusory allegations are "disentitle[d] . . . to the presumption of truth." *Iqbal,* 556 U.S. at 678.

Plaintiff's post-sale tampering claims rely on a single, conclusory allegation that "the Defendants' conduct in tampering with the emission control systems of used Affected Vehicles registered in Hillsborough County, through a program of newly created field fixes and recall campaigns, constitutes separate and independent violations of EPC Rule Chapter 1-8." D.E. 7, ¶ 90. Plaintiff does not allege any facts regarding the purported "field fixes and recall campaigns," such as their timing, the vehicles involved, or their purpose or effect. Nor does Plaintiff allege how such field fixes and recall campaigns would constitute tampering as it is defined in EPC Rule § 1-8.03(2), which prohibits "the intentional inactivation, disconnection, removal or other modification of a component or components of the emission control system resulting in it being inoperable," or that the operation or efficiency of the emission control systems of the Affected Vehicles was "circumvented, defeated, or deleteriously affected," *id.* Plaintiff does not even allege that these "field fixes and recall campaigns" resulted in increased emissions.

Aside from one sentence referring to the alleged "field fixes and recall campaigns," the Complaint focuses entirely on the *pre-sale* design, manufacture, and instal-

lation of alleged defeat devices. Plaintiff's fundamental theory is that the Affected Ve-hicles were "engineered to dupe the [EPA], among other regulators, into approving [them] for sale and use." D.E. 7, ¶ 1. The allegedly illegal software in the vehicles is described solely in terms of its impact on the certification process that occurs prior to initial sale. *E.g., id.* ¶ 44 ("The programming of these vehicles is meant to cheat the emissions certification standards."). As such, Plaintiff's allegations regarding the de-sign and installation of the defeat devices focus on the pre-sale emission certification process and allege that the defeat devices were intended to "enable the Affected Vehi-cles' diesel engines to pass federal emission tests" required for certification. D.E. 7, ¶ 37; *see id.* ¶¶ 32-34, 38-40, 44.

One conclusory sentence regarding "field fixes and recall campaigns" is clearly insufficient to satisfy Rule 8 by alleging facts that raise the right to relief for post-sale conduct above the threshold of "mere possibility." Plaintiff's post-sale tampering claims should therefore be dismissed for this additional reason.

### C.   Plaintiff Fails To State A Claim Upon Which Relief Can Be Granted With Respect To Certain Sprinter Vehicles.

Plaintiff fails to allege facts showing that all of the "Affected Vehicles" are cov-ered by EPC Chapter 1-8. EPC Chapter 1-8, including the tampering and defeat device provisions put at issue in the Complaint, expressly does not apply to motor vehicles "which have net vehicle weights greater than 5,000 pounds or gross vehicle weights greater than 10,000 pounds." EPC Rule § 1-8.04(1)(b). Some of the Sprinter models

put at issue in the Complaint exceed 10,000 pounds gross vehicle weight and are there-fore clearly outside the scope of EPC Chapter 1-8. Specifically, the model year 2010–2016 Sprinter 3500 vehicles are certified to the EPA's HDV2 standard, which applies only to vehicles in heavy-duty chassis class 3. MJN Exs. 6–19 (EPA Certificates of Conformity for model year 2010-2016 Sprinter 3500 vehicles). Heavy-duty chassis class 3 vehicles are those that exceed 10,000 pounds gross vehicle weight and are at or below 14,000 pounds gross vehicle weight. 40 C.F.R. § 86.1803-01. Plaintiff's tamper-ing claims should be dismissed for failure to allege facts showing that any of the Af-fected Vehicles are covered by EPC Chapter 1-8, and at a minimum, the claims regard-ing the vehicles clearly outside of EPC Chapter 1-8's requirements should be dis-missed.

### D. Plaintiff's Claims Are Barred By Florida's Statute of Limitations.

All of Plaintiff's claims must be dismissed for the independent reason that they are barred by the applicable four-year statute of limitations. The Florida statute of lim-itations for actions "founded on statutory liability," actions for statutory penalties, or actions that do not have limitations periods specifically provided is "within four years." FLA. STAT. § 95.11(3)(f), (n), (p) (2018); *see Stone v. Jackson Nat'l Life Ins. Co., 934 So. 2d 532, 535 (Fla. Dist. Ct. App. 2006)* (four-year statute of limitations applies to claims based on statutory violations). The statute of limitations begins to accrue "when the last element constituting the cause of action occurs." FLA. STAT. § 95.031(1) (2003); *see Suarez v. City of Tampa, 987 So. 2d 681, 684 (Fla. 3d DCA 2008)*. All of the

claims in the Complaint are for statutory violations, so the four-year statute of limitations applies. Dismissal under Rule 12(b)(6) on statute of limitations grounds is appropriate "if it is apparent from the face of the complaint that the claim is time-barred." *La Grasta v. First Union Securities, Inc.*, 358 F.3d 840, 845 (11th Cir. 2004) (internal quotation marks omitted).

Plaintiff's claims are based on the design, manufacture, and installation of defeat devices in model year 2007–2016 vehicles. In alleging these violations, Plaintiff's Complaint relies on public documents identifying the alleged conduct at issue more than four years before this lawsuit was filed. *See* D.E. 7, ¶¶ 58, 60 (allegations regarding a report published on April 22, 2016). Beyond that, as discussed in Part II.B, *supra*, Plaintiff makes no factual allegations regarding tampering that occurred after the manufacture and sale of the Affected Vehicles, nor that any of the alleged conduct occurred after September 24, 2016. Thus, it is clear from the face of the Complaint that Plaintiff's claims are time-barred and should be dismissed with prejudice.

Plaintiff pleads no basis for tolling the statute of limitations. "When the time-bar is apparent from the face of the complaint, the plaintiff bears the burden of pleading allegations sufficient to toll the statute of limitations." *Heuer v. Nissan N. Am., Inc.*, No. 17-60018, 2017 WL 3475063, at *4 (S.D. Fla. Aug. 11, 2017); *see Patel v. Diplomat 1419VA Hotels, LLC*, 605 F. App'x 965, 966 (11th Cir. 2015) (same). Plaintiff alleges that the statute of limitations should be tolled based on theories of discovery rule tolling and fraudulent concealment. *See* D.E. 7, ¶¶ 77–82. However, "in order to employ

the discovery rule to delay accrual of a cause of action, a potential plaintiff who suspects that an injury has been wrongfully caused must conduct a reasonable investigation of all potential causes of that injury." *Rodriguez v. Bayer Corp.*, 440 F. App'x 813, 815 (11th Cir. 2011). Similarly, "[t]o toll the statute of limitations as a result of fraudulent concealment, a plaintiff 'must allege . . . [that it] exercised reasonable care and diligence in seeking to discover the facts that form the basis of [the plaintiff's] claim.'" *Heuer*, 2017 WL 3475063, at *3 (internal citations omitted) (granting defendant's motion to dismiss on statute of limitations grounds because plaintiff did not plead the required elements to toll the statute of limitations based on fraudulent concealment).

Plaintiff makes a conclusory assertion that it "could not have discovered" the alleged tampering within the applicable limitations period, D.E. 7, ¶ 78, but the assertion is belied by the Complaint's express reliance on public reporting of the complained-of conduct from April 2016, *see, e.g.*, D.E. 7, ¶¶ 58, 60 (allegations regarding a report published on April 22, 2016). Similarly, the Complaint acknowledges that Daimler is cooperating in an investigation by the U.S. Department of Justice ("DOJ"), *see id.* ¶ 1 n.2, but Daimler publicly announced that investigation on April 22, 2016— again, more than four years before Plaintiff filed this case. MJN, Ex. 1 (Daimler press release regarding DOJ investigation).

Plaintiff also admits awareness of "ongoing litigation beginning in 2015" against diesel vehicle manufacturers. D.E. 7, ¶ 1. This litigation includes a consumer class action filed on February 18, 2016 against Daimler and MBUSA that makes essentially the same allegations Plaintiff does here. *See In re Mercedes-Benz Emissions Litig.*,

No. 2:16-cv-00881 (D.N.J. Feb. 18, 2016). In fact, Plaintiff even copied verbatim several allegations from that class action complaint. *Compare, e.g.*, D.E. 7, ¶¶ 4, 34–35, 60, *with* Fifth Am. Compl., *In re Mercedes-Benz*, Dkt. 185, ¶¶ 5, 8–9, 135.

Further, as Plaintiff acknowledges, Plaintiff has been litigating an allegedly "identical" case against Volkswagen since March 24, 2016. D.E. 7, ¶ 37. In light of the public reporting of investigations into the Affected Vehicles in early 2016, well-publicized litigation against the diesel vehicle manufacturers at that time, and *Plaintiff's own participation in that litigation*, it is highly problematic that Plaintiff does not allege that it undertook any investigation whatsoever of the allegations in the Complaint until apparently "just before the Complaint was filed." *Id.* ¶ 79. The failure to do so bars Plaintiff from tolling the statute of limitations based on fraudulent concealment or the discovery rule. *Heuer*, 2017 WL 3475063, at *3 (granting defendant's motion to dismiss on statute of limitations grounds because plaintiff did not plead the required elements to toll the statute of limitations based on fraudulent concealment); *Licul v. Volkswagen Grp. of Am., Inc.*, No. 13–61686–CIV, 2013 WL 6328734, at *6 (S.D. Fla. Dec. 5, 2013) ("[A]llegations of [the defendant's] inaction and non-disclosure are wholly insufficient to supply the affirmative steps taken to prevent Plaintiffs from discovering the basis of their claims that would be necessary before tolling based on fraudulent concealment becomes appropriate.").

Anticipating this problem, Plaintiff argues that the Defendants should be "estopped" from relying on the statute of limitations, but the argument fails. "Equitable estoppel presupposes that the plaintiff knows of the facts underlying the cause of action

34

but delayed filing suit because of the defendant's conduct," such as the wrongdoer "prevail[ing] upon the other to forego enforcing his right until the statutory time has lapsed." *Ryan v. Lobo de Gonzalez*, 841 So. 2d 510, 518–19 (Fla. 4th DCA 2003). Here, Plaintiff does not (and cannot) allege that the Defendants took any action that caused Plaintiff to forego enforcing its rights in a timely fashion. *See id.* Rather, Plaintiff knew of all of the facts giving rise to its Complaint, or, at a minimum, was on inquiry notice of them in at least April 2016. Its failure to assert its claims within the four-year limitations period or even to conduct an investigation into its claims was due to no fault of the Mercedes Defendants and bars Plaintiff from tolling the statute of limitations. *Heuer*, 2017 WL 3475063, at *3. Plaintiff simply slept on its rights while other litigation against diesel-vehicle manufacturers—which Plaintiff has been actively involved in for almost five years—played out. This is a textbook case calling for application of the statute of limitations to dismiss this untimely action.

## IV.   CONCLUSION

For the foregoing reasons, the Mercedes Defendants respectfully request that this Court dismiss the Second Amended Complaint in its entirety, with prejudice.

Dated:  February 8, 2021

Respectfully submitted,

*s/ William J. Schifino, Jr.*
William J. Schifino, Jr., Esq.
Florida Bar No.:  564338
John A. Schifino, Esq.
Florida Bar No.:  72321
Ryan L. Hedstrom, Esq.
Florida Bar No.:  124724
**GUNSTER**
401 E. Jackson Street, Suite 2500
Tampa, Florida  33602
Tel:    (813) 222-6619
Fax:    (813) 228-6739
wschifino@gunster.com
jschifino@gunster.com
rhesdstrom@gunster.com
kkovach@gunster.com
csanders@gunster.com

Gregory M. Munson, Esq.
Florida Bar No.:  188344
**GUNSTER**
215 South Monroe Street
Suite 601
Tallahassee, Florida  32301
Tel:    (850) 521-1980
Fax:    (850) 576-0902
gmunson@gunster.com
bfrazier@gunster.com

*s/ Daniel W. Nelson*
Daniel W. Nelson, Esq.
  *admitted pro hac vice*
Stacie B. Fletcher, Esq.
  *admitted pro hac vice*
**GIBSON DUNN & CRUTCHER LLP**
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Tel:    (202) 887-3687
Fax:    (202) 530-9571
dnelson@gibsondunn.com
sfletcher@gibsondunn.com

Troy M. Yoshino, Esq.
  *admitted pro hac vice*
**SQUIRE PATTON BOGGS LLP**
275 Battery Street, Suite 2600
San Francisco, California  94111
Tel:    (415) 954-0200
Fax:    (415) 393-9887
troy.yoshino@squirepb.com

***Counsel for Defendants Daimler Aktienge-***
***sellschaft and Mercedes-Benz USA, LLC***

## <u>LOCAL RULE 3.01(g) CERTIFICATION</u>

Pursuant to Local Rule 3.01(g), counsel for the Mercedes Defendants conferred with counsel for Plaintiff Environmental Protection Commission of Hillsborough County, Florida regarding the relief sought herein. The parties were unable to agree on the resolution of all or part of this Motion. Specifically, on January 25, 2021, counsel for the Mercedes Defendants sent an email to counsel for Plaintiff, explaining that the Mercedes Defendants intended to move for dismissal on federal preemption, failure-to-state a claim, and statute of limitations grounds. Counsel for the Mercedes Defendants inquired whether Plaintiff would consent to dismissal on these grounds, and offered to speak further on the issue by phone. Counsel for Plaintiff responded "Plaintiff does NOT consent to the motion to dismiss."

*s/ William J. Schifino, Jr.*
William J. Schifino, Jr., Esq.

## <u>CERTIFICATE OF SERVICE</u>

I certify that on February 8, 2021, a true and accurate copy of the foregoing was filed with the Court via CM/ECF, which will send a notice of electronic filing to all counsel of record.

*s/ William J. Schifino, Jr.*
William J. Schifino, Jr., Esq.
